JONES ᴇᴛ ᴀʟ. *v.* WOLF ᴇᴛ ᴀʟ.

No. 78–91.  Argued January 16, 1979—Decided July 2, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, REHNQUIST, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART and WHITE, JJ., joined, *post,* p. 610.

*E. Barrett Prettyman, Jr.,* argued the cause for petitioners. With him on the briefs were *Allen R. Snyder, Walter A. Smith, Jr., John B. Harris, Jr., T. Reese Watkins,* and *H. T. O'Neal, Jr.*

*Frank C. Jones* argued the cause for respondents. With him on the brief were *Wallace Miller, Jr., W. Warren Plowden, Jr.,* and *Edward S. Sell, Jr.\**

---

*Briefs of *amici curiae* urging reversal were filed by *Samuel W. Witwer, Sr.,* and *Samuel W. Witwer, Jr.,* for the General Council on Finance and Administration of the United Methodist Church; by *J. D. Todd, Jr.,* and *David A. Quattlebaum III* for the Presbyterian Church in the United

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case involves a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization. The question for decision is whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the dispute on the basis of "neutral principles of law," or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church.

I

The Vineville Presbyterian Church of Macon, Ga., was organized in 1904, and first incorporated in 1915. Its corporate charter lapsed in 1935, but was revived and renewed in 1939, and continues in effect at the present time.

The property at issue and on which the church is located was acquired in three transactions, and is evidenced by conveyances to the "Trustees of [or 'for'] Vineville Presbyterian Church and their successors in office," App. 251, 253, or simply to the "Vineville Presbyterian Church." *Id.*, at 249. The funds used to acquire the property were contributed entirely by local church members. Pursuant to resolutions adopted by the congregation, the church repeatedly has borrowed money on the property. This indebtedness is evidenced by security deeds variously issued in the name of the "Trustees of the Vineville Presbyterian Church," *e. g., id.*, at 278, or, again, simply the "Vineville Presbyterian Church." *Id.*, at 299.

In the same year it was organized, the Vineville church was established as a member church of the Augusta-Macon Presbytery of the Presbyterian Church in the United States (PCUS). The PCUS has a generally hierarchical or connec-

States; and by *George Wilson McKeag* and *Gregory M. Harvey* for William P. Thompson et al.

*George E. Reed* and *Patrick F. Geary* filed a brief for the United States Catholic Conference as *amicus curiae*.

tional form of government, as contrasted with a congregational form. Under the polity of the PCUS, the government of the local church is committed to its Session in the first instance, but the actions of this assembly or "court" are subject to the review and control of the higher church courts, the Presbytery, Synod, and General Assembly, respectively. The powers and duties of each level of the hierarchy are set forth in the constitution of the PCUS, the Book of Church Order, which is part of the record in the present case.

On May 27, 1973, at a congregational meeting of the Vineville church attended by a quorum of its duly enrolled members, 164 of them, including the pastor, voted to separate from the PCUS. Ninety-four members opposed the resolution. The majority immediately informed the PCUS of the action, and then united with another denomination, the Presbyterian Church in America. Although the minority remained on the church rolls for three years, they ceased to participate in the affairs of the Vineville church and conducted their religious activities elsewhere.

In response to the schism within the Vineville congregation, the Augusta-Macon Presbytery appointed a commission to investigate the dispute and, if possible, to resolve it. The commission eventually issued a written ruling declaring that the minority faction constituted "the true congregation of Vineville Presbyterian Church," and withdrawing from the majority faction "all authority to exercise office derived from the [PCUS]." App. 235. The majority took no part in the commission's inquiry, and did not appeal its ruling to a higher PCUS tribunal.

Representatives of the minority faction sought relief in federal court, but their complaint was dismissed for want of jurisdiction. *Lucas* v. *Hope*, 515 F. 2d 234 (CA5 1975), cert. denied, 424 U. S. 967 (1976). They then brought this class action in state court, seeking declaratory and injunctive orders establishing their right to exclusive possession and use of the

Vineville church property as a member congregation of the PCUS. The trial court, purporting to apply Georgia's "neutral principles of law" approach to church property disputes, granted judgment for the majority. The Supreme Court of Georgia, holding that the trial court had correctly stated and applied Georgia law, and rejecting the minority's challenge based on the First and Fourteenth Amendments, affirmed. 241 Ga. 208, 243 S. E. 2d 860 (1978). We granted certiorari. 439 U. S. 891 (1978).

## II

Georgia's approach to church property litigation has evolved in response to *Presbyterian Church* v. *Hull Church,* 393 U. S. 440 (1969) (*Presbyterian Church I*), rev'g *Presbyterian Church* v. *Eastern Heights Church,* 224 Ga. 61, 159 S. E. 2d 690 (1968). That case was a property dispute between the PCUS and two local Georgia churches that had withdrawn from the PCUS. The Georgia Supreme Court resolved the controversy by applying a theory of implied trust, whereby the property of a local church affiliated with a hierarchical church organization was deemed to be held in trust for the general church, provided the general church had not "substantially abandoned" the tenets of faith and practice as they existed at the time of affiliation.[1] This Court reversed, holding that Georgia would have to find some other way of resolving church property disputes that did not draw the state courts into religious controversies. The Court did not specify what that method should be, although it noted in passing that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." 393 U. S., at 449.

---

[1] This is sometimes referred to as the "English approach" to resolving property disputes in hierarchical churches. See *Presbyterian Church I,* 393 U. S., at 433, and n. 2; *Watson* v. *Jones,* 13 Wall. 679, 727–728 (1872).

On remand, the Georgia Supreme Court concluded that, without the departure-from-doctrine element, the implied trust theory would have to be abandoned in its entirety. *Presbyterian Church* v. *Eastern Heights Church*, 225 Ga. 259, 167 S. E. 2d 658 (1969) (*Presbyterian Church II*). In its place, the court adopted what is now known as the "neutral principles of law" method for resolving church property disputes. The court examined the deeds to the properties, the state statutes dealing with implied trusts, Ga. Code §§ 108–106, 108–107 (1978), and the Book of Church Order to determine whether there was any basis for a trust in favor of the general church. Finding nothing that would give rise to a trust in any of these documents, the court awarded the property on the basis of legal title, which was in the local church, or in the names of trustees for the local church. 225 Ga., at 261, 167 S. E. 2d, at 660. Review was again sought in this Court, but was denied. 396 U. S. 1041 (1970).

The neutral-principles analysis was further refined by the Georgia Supreme Court in *Carnes* v. *Smith*, 236 Ga. 30, 222 S. E. 2d 322, cert. denied, 429 U. S. 868 (1976). That case concerned a property dispute between The United Methodist Church and a local congregation that had withdrawn from that church. As in *Presbyterian Church II*, the court found no basis for a trust in favor of the general church in the deeds, the corporate charter, or the state statutes dealing with implied trusts. The court observed, however, that the constitution of The United Methodist Church, its Book of Discipline, contained an express trust provision in favor of the general church.[2] On this basis, the church property was

---

[2] The Book of Discipline of The United Methodist Church ¶ 1537 (1968) requires that

"title to all real property now owned or hereafter acquired by an unincorporated local church . . . shall be held by and/or conveyed and transferred to its duly elected trustees . . . and their successors in office . . . in trust, nevertheless, for the use and benefit of such local church *and of*

awarded to the denominational church. 236 Ga., at 39, 222 S. E. 2d, at 328.

In the present case, the Georgia courts sought to apply the neutral-principles analysis of *Presbyterian Church II* and *Carnes* to the facts presented by the Vineville church controversy. Here, as in those two earlier cases, the deeds conveyed the property to the local church. Here, as in the earlier cases, neither the state statutes dealing with implied trusts, nor the corporate charter of the Vineville church, indicated that the general church had any interest in the property. And here, as in *Presbyterian Church II,* but in contrast to *Carnes,* the provisions of the constitution of the general church, the Book of Church Order, concerning the ownership and control of property failed to reveal any language of trust in favor of the general church. The courts accordingly held that legal title to the property of the Vineville church was vested in the local congregation. Without further analysis or elaboration, they further decreed that the local congregation was represented by the majority faction, respondents herein. App. to Pet. for Cert. 9a.; 241 Ga., at 212, 243 S. E. 2d, at 864.

---

*The United Methodist Church.* Every instrument of conveyance of real estate shall contain the appropriate trust clause as set forth in the Discipline (¶ 1503)" (emphasis added).

Although in *Carnes* the deeds to the local church did not contain the required trust clause, The Book of Discipline provided that in the absence of a trust clause, a trust in favor of The United Methodist Church was to be implied if (a) the conveyance was to the trustees of a local church or agency of any predecessor to The United Methodist Church, or (b) the local church used the name of any predecessor to The United Methodist Church and was known to the community as a part of the denomination, or (c) the local church accepted the pastorate of ministers appointed by any predecessor to The United Methodist Church. The Book of Discipline ¶ 1503.5. The local church in *Carnes* satisfied all three of these conditions. 236 Ga., at 39, 222 S. E. 2d, at 328.

## III

The only question presented by this case is which faction of the formerly united Vineville congregation is entitled to possess and enjoy the property located at 2193 Vineville Avenue in Macon, Ga. There can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively. *Presbyterian Church I,* 393 U. S., at 445.

It is also clear, however, that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Id.,* at 449. Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U. S. 696, 710 (1976); *Maryland & Va. Churches* v. *Sharpsburg Church,* 396 U. S. 367, 368 (1970); *Presbyterian Church I,* 393 U. S., at 449. As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. *Serbian Orthodox Diocese,* 426 U. S., at 724–725; cf. *Watson* v. *Jones,* 13 Wall. 679, 733–734 (1872). Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Maryland & Va. Churches,* 396 U. S., at 368 (BRENNAN, J., concurring) (emphasis in original).

At least in general outline, we think the "neutral principles of law" approach is consistent with the foregoing constitutional principles. The neutral-principles approach was ap-

proved in *Maryland & Va. Churches, supra,* an appeal from a judgment of the Court of Appeals of Maryland settling a local church property dispute on the basis of the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property. Finding that this analysis entailed "no inquiry into religious doctrine," the Court dismissed the appeal for want of a substantial federal question. 396 U. S., at 368. "Neutral principles of law" also received approving reference in *Presbyterian Church I,* 393 U. S., at 449; in MR. JUSTICE BRENNAN's concurrence in *Maryland & Va. Churches,* 396 U. S., at 370; and in *Serbian Orthodox Diocese,* 426 U. S., at 723 n. 15.[3]

The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization

---

[3] Indeed, even in *Watson* v. *Jones,* a common-law decision heavily relied upon by the dissent, Mr. Justice Miller, in speaking for the Court, stated that, regardless of the form of church government, it would be the "obvious duty" of a civil tribunal to enforce the "express terms" of a deed, will, or other instrument of church property ownership. 13 Wall., at 722–723.

can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

This is not to say that the application of the neutral-principles approach is wholly free of difficulty. The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. *Serbian Orthodox Diocese,* 426 U. S., at 709.

On balance, however, the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application. These problems, in addition, should be gradually eliminated as recognition is given to the obligation of "States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Presbyterian Church I,* 393 U. S., at 449. We therefore hold that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute.

The dissent would require the States to abandon the neutral-principles method, and instead would insist as a matter of constitutional law that whenever a dispute arises over the

ownership of church property, civil courts must defer to the "authoritative resolution of the dispute within the church itself." *Post,* at 614. It would require, first, that civil courts review ecclesiastical doctrine and polity to determine where the church has "placed ultimate authority over the use of the church property." *Post,* at 619. After answering this question, the courts would be required to "determine whether the dispute has been resolved within that structure of government and, if so, what decision has been made." *Post,* at 619 n. 6. They would then be required to enforce that decision. We cannot agree, however, that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved.

The dissent suggests that a rule of compulsory deference would somehow involve less entanglement of civil courts in matters of religious doctrine, practice, and administration. Under its approach, however, civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous, and "[a] careful examination of the constitutions of the general and local church, as well as other relevant documents, [would] be necessary to ascertain the form of governance adopted by the members of the religious association." *Post,* at 619–620. In such cases, the suggested rule would appear to require "a searching and therefore impermissible inquiry into church polity." *Serbian Orthodox Diocese,* 426 U. S., at 723. The neutral-principles approach, in contrast, obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes.

The dissent also argues that a rule of compulsory deference is necessary in order to protect the free exercise rights "of

those who have formed the association and submitted themselves to its authority." *Post,* at 618. This argument assumes that the neutral-principles method would somehow frustrate the free-exercise rights of the members of a religious association. Nothing could be further from the truth. The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.[4]

## IV

It remains to be determined whether the Georgia neutral-principles analysis was constitutionally applied on the facts of this case. Although both the trial court and the Supreme Court of Georgia viewed the case as involving nothing more than an application of the principles developed in *Presbyterian Church II* and in *Carnes,* the present case contains a significant complicating factor absent in each of those earlier cases. *Presbyterian Church II* and *Carnes* each involved a

---

[4] Given that the Georgia Supreme Court clearly enunciated its intent to follow the neutral-principles analysis in *Presbyterian Church II* and *Carnes,* this case does not involve a claim that retroactive application of a neutral-principles approach infringes free-exercise rights.

church property dispute between the general church and the entire local congregation. Here, the local congregation was itself divided between a majority of 164 members who sought to withdraw from the PCUS, and a minority of 94 members who wished to maintain the affiliation. Neither of the state courts alluded to this problem, however; each concluded without discussion or analysis that the title to the property was in the local church and that the local church was represented by the majority rather than the minority.

Petitioners earnestly submit that the question of which faction is the true representative of the Vineville church is an ecclesiastical question that cannot be answered by a civil court. At least, it is said, it cannot be answered by a civil court in a case involving a hierarchical church, like the PCUS, where a duly appointed church commission has determined which of the two factions represents the "true congregation." Respondents, in opposition, argue in effect that the Georgia courts did no more than apply the ordinary presumption that, absent some indication to the contrary, a voluntary religious association is represented by a majority of its members.

If in fact Georgia has adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, we think this would be consistent with both the neutral-principles analysis and the First Amendment. Majority rule is generally employed in the governance of religious societies. See *Bouldin* v. *Alexander*, 15 Wall. 131 (1872). Furthermore, the majority faction generally can be identified without resolving any question of religious doctrine or polity. Certainly, there was no dispute in the present case about the identity of the duly enrolled members of the Vineville church when the dispute arose, or about the fact that a quorum was present, or about the final vote. Most importantly, any rule of majority representation can always be overcome, under the neutral-principles approach, either by providing, in the corporate

charter or the constitution of the general church, that the identity of the local church is to be established in some other way, or by providing that the church property is held in trust for the general church and those who remain loyal to it. Indeed, the State may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free-exercise rights or entangle the civil courts in matters of religious controversy.[5]

Neither the trial court nor the Supreme Court of Georgia, however, explicitly stated that it was adopting a presumptive rule of majority representation.[6] Moreover, there are at least some indications that under Georgia law the process of identifying the faction that represents the Vineville church involves considerations of religious doctrine and polity. Georgia law requires that "church property be held according to the terms of the church government," and provides that a local church affiliated with a hierarchical religious association "is part of the whole body of the general church and is subject to the higher authority of the organization and its laws and regulations." *Carnes* v. *Smith*, 236 Ga., at 33, 38, 222 S. E. 2d, at

---

[5] If the Georgia Supreme Court adopts a rule of presumptive majority representation on remand, then it should also specify how, under Georgia law, that presumption may be overcome. Because these critical issues of state law remain undetermined, we, unlike the dissent, express no view as to the ultimate outcome of the controversy if the Georgia Supreme Court adopts a presumptive rule of majority representation.

[6] The Georgia Code contains the following provision dealing with the identity of a religious corporation:

"The majority of those who adhere to its organization and doctrines represent the church. The withdrawal by one part of a congregation from the original body, or uniting with another church or denomination, is a relinquishment of all rights in the church abandoned." Ga. Code § 22–5504 (1978).

The trial court noted that the defendants (respondents here) did not claim any right of possession of the Vineville church property under this section. App. to Pet. for Cert. 6a. The Georgia Supreme Court did not mention the provision.

325, 328; see Ga. Code §§ 22–5507, 22–5508 (1978). All this may suggest that the identity of the "Vineville Presbyterian Church" named in the deeds must be determined according to terms of the Book of Church Order, which sets out the laws and regulations of churches affiliated with the PCUS. Such a determination, however, would appear to require a civil court to pass on questions of religious doctrine,[7] and to usurp the function of the commission appointed by the Presbytery, which already has determined that petitioners represent the "true congregation" of the Vineville church. Therefore, if Georgia law provides that the identity of the Vineville church is to be determined according to the "laws and regulations" of the PCUS, then the First Amendment requires that the Georgia courts give deference to the presbyterial commission's determination of that church's identity.[8]

This Court, of course, does not declare what the law of Georgia is. Since the grounds for the decision that respond-

---

[7] Issues of church doctrine and polity pervade the provisions of the Book of Church Order of the Presbyterian Church (1972) dealing with the identity of the local congregation. The local church corporation consists of "all the communing members on the active roll" of the church. *Id.,* § 6–2; App. 35. The "active roll," in turn, is composed "of those admitted to the Lord's Table who are active in the church's life and work." § 8–7; App. 38. The Session is given the power "to suspend or exclude from the Lord's Supper those found delinquent, according to the Rules of Discipline." § 15–6 (2); App. 51. See § 111–2; App. 124. The Session is subject to "the review and control" of the Presbytery, § 14–5; App. 49, as a part of the Presbytery's general authority to "order whatever pertains to the spiritual welfare of the churches under its care." § 16–7 (19); App. 56.

[8] There is no suggestion in this case that the decision of the commission was the product of "fraud" or "collusion." See *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U. S. 696, 713 (1976). In the absence of such circumstances, "the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Id.,* at 709.

ents represent the Vineville church remain unarticulated, the judgment of the Supreme Court of Georgia is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE WHITE join, dissenting.

This case presents again a dispute among church members over the control of a local church's property. Although the Court appears to accept established principles that I have thought would resolve this case, it superimposes on these principles a new structure of rules that will make the decision of these cases by civil courts more difficult. The new analysis also is more likely to invite intrusion into .church polity forbidden by the First Amendment.

## I

The Court begins by stating that "[t]his case involves a dispute over the ownership of church property," *ante,* at 597, suggesting that the concern is with legal or equitable ownership in the real property sense. But the ownership of the property of the Vineville church is not at issue. The deeds place title in the Vineville Presbyterian Church, or in trustees of that church, and none of the parties has questioned the validity of those deeds. The question actually presented is which of the factions within the local congregation has the right to control the actions of the titleholder, and thereby to control the use of the property, as the Court later acknowledges. *Ante,* at 602.

Since 1872, disputes over control of church property usually have been resolved under principles established by *Watson* v. *Jones,* 13 Wall. 679 (1872). Under the new and complex, two-stage analysis approved today, a court instead first must apply newly defined "neutral principles of law" to determine

whether property titled to the local church is held in trust for the general church organization with which the local church is affiliated. If it is, then the court will grant control of the property to the councils of the general church. If not, then control by the local congregation will be recognized. In the latter situation, if there is a schism in the local congregation, as in this case, the second stage of the new analysis becomes applicable. Again, the Court fragments the analysis into two substeps for the purpose of determining which of the factions should control the property.

As this new approach inevitably will increase the involvement of civil courts in church controversies, and as it departs from long-established precedents, I dissent.

## A

The first stage in the "neutral principles of law" approach operates as a restrictive rule of evidence. A court is required to examine the deeds to the church property, the charter of the local church (if there is one), the book of order or discipline of the general church organization, and the state statutes governing the holding of church property. The object of the inquiry, where the title to the property is in the local church, is "to determine whether there [is] any basis for a trust in favor of the general church." *Ante,* at 600. The court's investigation is to be "completely secular," "rel[ying] exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Ante,* at 603. Thus, where religious documents such as church constitutions or books of order must be examined "for language of trust in favor of the general church," "a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Ante,* at 604. It follows that the civil courts using this analysis may consider the form of religious govern-

ment adopted by the church members for the resolution of intrachurch disputes *only* if that polity has been stated, in express relation to church property, in the language of trust and property law.[1]

One effect of the Court's evidentiary rule is to deny to the courts relevant evidence as to the religious polity—that is, the form of governance—adopted by the church members. The constitutional documents of churches tend to be drawn in terms of religious precepts. Attempting to read them "in purely secular terms" is more likely to promote confusion than understanding. Moreover, whenever religious polity has not been expressed in specific statements referring to the property

---

[1] Despite the Court's assertion to the contrary, *ante*, at 602–603, this "neutral principles" approach was not approved by the Court in dismissing the appeal in *Maryland & Va. Eldership* v. *Sharpsburg Church*, 254 Md. 162, 254 A. 2d 162 (1969). 396 U. S. 367 (1970). The state court there examined the constitution of the general church, the charters of the local churches, the deeds to the property at issue, and the relevant state statutes. But it did not restrict its inquiry to a search for statements expressed in the language of trust and property law; see 254 Md., at 169–176, 254 A. 2d, at 168–170. Rather, the state court canvassed all of these sources, and others, see *Maryland & Va. Eldership* v. *Sharpsburg Church*, 249 Md. 650, 665–668, 241 A. 2d 691, 700–701 (1968), for information about the basic polity of the Church of God. Having concluded that the local congregations retained final authority over their property, it awarded judgment accordingly. Contrary to the statement of the Court in the present case that such an inquiry into church polity requires analysis of "ecclesiastical . . . doctrine," *ante*, at 605, "the Maryland court's resolution of the dispute involved no inquiry into religious doctrine." 396 U. S., at 368.

In *Presbyterian Church* v. *Hull Church*, 393 U. S. 440 (1969), "neutral principles" were referred to in passing, but were never described. *Id.*, at 449. What the Court refers to as an "approving reference" to "neutral principles" in *Serbian Orthodox Diocese* v. *Milivojevich*, 426 U. S. 696 (1976), was only an acknowledgment in a footnote that "[n]o claim is made that the 'formal title' doctrine by which church property disputes may be decided in civil courts is to be applied in this case." *Id.*, at 723 n. 15. Nor can the Court find support for its position in *Watson* v. *Jones*, 13 Wall. 679, 724–729 (1872).

of a church, there will be no evidence of that polity cognizable under the neutral-principles rule. Lacking such evidence, presumably a court will impose some rule of church government derived from state law. In the present case, for example, the general and unqualified authority of the Presbytery over the actions of the Vineville church had not been expressed in secular terms of control of its property. As a consequence, the Georgia courts could find no acceptable evidence of this authoritative relationship, and they imposed instead a congregational form of government determined from state law.

This limiting of the evidence relative to religious government cannot be justified on the ground that it "free[s] civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Ante,* at 603. For unless the body identified as authoritative under state law resolves the underlying dispute in accord with the decision of the church's own authority, the state court effectively will have reversed the decisions of doctrine and practice made in accordance with church law. The schism in the Vineville church, for example, resulted from disagreements among the church members over questions of doctrine and practice. App. 233. Under the Book of Church Order, these questions were resolved authoritatively by the higher church courts, which then gave control of the local church to the faction loyal to that resolution. The Georgia courts, as a matter of state law, granted control to the schismatic faction, and thereby effectively reversed the doctrinal decision of the church courts. This indirect interference by the civil courts with the resolution of religious disputes within the church is no less proscribed by the First Amendment than is the direct decision of questions of doctrine and practice.[2]

---

[2] The neutral-principles approach appears to assume that the requirements of the Constitution will be satisfied if civil courts are forbidden to consider certain types of evidence. The First Amendment's Religion Clauses, however, are meant to protect churches and their members from civil law interference, not to protect the courts from having to decide

When civil courts step in to resolve intrachurch disputes over control of church property, they will either support or overturn the authoritative resolution of the dispute within the church itself. The new analysis, under the attractive banner of "neutral principles," actually invites the civil courts to do the latter. The proper rule of decision, that I thought had been settled until today, requires a court to give effect in all cases to the decisions of the church government agreed upon by the members before the dispute arose.

## B

The Court's basic neutral-principles approach, as a means of isolating decisions concerning church property from other decisions made within the church, relies on the concept of a trust of local church property in favor of the general church. Because of this central premise, the neutral-principles rule suffices to settle only disputes between the central councils of a church organization and a unanimous local congregation. Where, as here, the neutral-principles inquiry reveals no trust in favor of the general church, and the local congregation is split into factions, the basic question remains unresolved: which faction should have control of the local church?

difficult evidentiary questions. Thus, the evidentiary rules to be applied in cases involving intrachurch disputes over church property should be fashioned to avoid interference with the resolution of the dispute within the accepted church government. The neutral-principles approach consists instead of a rule of evidence that ensures that in some cases the courts will impose a form of church government and a doctrinal resolution at odds with that reached by the church's own authority.

The neutral-principles approach creates other difficulties. It imposes on the organization of churches additional legal requirements which in some cases might inhibit their formation by forcing the organizers to confront issues that otherwise might never arise. It also could precipitate church property disputes, for existing churches may deem it necessary, in light of today's decision, to revise their constitutional documents, charters, and deeds to include a specific statement of church polity in the language of property and trust law.

The Court acknowledges that the church law of the Presbyterian Church in the United States (PCUS), of which the Vineville church is a part, provides for the authoritative resolution of this question by the Presbytery. *Ante,* at 608–609, and n. 7. Indeed, the Court indicates that Georgia, consistently with the First Amendment, may adopt the *Watson* v. *Jones* rule of adherence to the resolution of the dispute according to church law—a rule that would necessitate reversal of the judgment for the respondents. *Ante,* at 609. But instead of requiring the state courts to take this approach, the Court approves as well an alternative rule of state law: the Georgia courts are said to be free to "adop[t] a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means." *Ante,* at 607. This showing may be made by proving that the church has "provid[ed], in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way." *Ante,* at 607–608.

On its face, this rebuttable presumption also requires reversal of the state court's judgment in favor of the schismatic faction. The polity of the PCUS commits to the Presbytery the resolution of the dispute within the local church. Having shown this structure of church government for the determination of the identity of the local congregation, the petitioners have rebutted any presumption that this question has been left to a majority vote of the local congregation.

The Court nevertheless declines to order reversal. Rather than decide the case here in accordance with established First Amendment principles, the Court leaves open the possibility that the state courts might adopt some restrictive evidentiary rule that would render the petitioners' evidence inadequate to overcome the presumption of majority control. *Ante,* at 608 n. 5. But, aside from a passing reference to the use of the neutral-principles approach developed earlier in its

opinion,[3] the Court affords no guidance as to the constitutional limitations on such an evidentiary rule; the state courts, it says, are free to adopt any rule that is constitutional.

> "Indeed, the state may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free-exercise rights or entangle the civil courts in matters of religious controversy." *Ante,* at 608.

In essence, the Court's instructions on remand therefore allow the state courts the choice of following the long-settled rule of *Watson* v. *Jones* or of adopting some other rule—unspecified by the Court—that the state courts view as consistent with the First Amendment. Not only questions of state law but also important issues of federal constitutional law thus are left to the state courts for their decision, and, if they depart from *Watson* v. *Jones,* they will travel a course left totally uncharted by this Court.

## II

Disputes among church members over the control of church property arise almost invariably out of disagreements regarding doctrine and practice. Because of the religious nature of these disputes, civil courts should decide them according to principles that do not interfere with the free exercise of religion in accordance with church polity and doctrine. *Serbian*

---

[3] *Ante,* at 607–608. Such a use would be an extension of this restrictive rule of evidence, and one likely to exacerbate further the interference with free religious exercise. See *supra,* at 612–614. Not only will a local congregation of a general hierarchical church be treated as an independent congregational church *unless* the rules of church government have been expressed in specified documents with explicit reference to church property, in addition, all local congregations will be regarded as having a rule of majority control *unless* they have related their general voting rules explicitly to disputes about church property. As a consequence, the resolution of doctrinal disputes within the polity chosen by the church members often will be overturned by the civil courts, an interference with religious exercise that cannot be squared with the First Amendment.

*Orthodox Diocese* v. *Milivojevich,* 426 U. S. 696, 709, 720 (1976); *Presbyterian Church* v. *Hull Church,* 393 U. S. 440, 445–446, 449 (1969); *Kedroff* v. *Saint Nicholas Cathedral,* 344 U. S. 94, 107 (1952); *id.,* at 121–122 (Frankfurter, J., concurring). See also *Kreshik* v. *Saint Nicholas Cathedral,* 363 U. S. 190 (1960); *Maryland & Va. Eldership* v. *Sharpsburg Church,* 254 Md. 162, 254 A. 2d 162 (1969), appeal dismissed for want of substantial federal question, 396 U. S. 367 (1970). The only course that achieves this constitutional requirement is acceptance by civil courts of the decisions reached within the polity chosen by the church members themselves. The classic statement of this view is found in *Watson* v. *Jones,* 13 Wall., at 728–729:[4]

> "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious

[4] *Watson* v. *Jones* was decided at a time when the First Amendment was not considered to be applicable to the States through the Fourteenth Amendment, and before *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), made state law applicable in diversity cases. But beginning with *Kedroff* v. *Saint Nicholas Cathedral,* 344 U. S., at 116, this Court has indicated repeatedly that the principles of general federal law announced in *Watson* v. *Jones* are now regarded as rooted in the First Amendment, and are applicable to the States through the Fourteenth Amendment. *Presbyterian Church* v. *Hull Church,* 393 U. S., at 447–448; *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U. S., at 710–711.

unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

Accordingly, in each case involving an intrachurch dispute—including disputes over church property—the civil court must focus directly on ascertaining, and then following, the decision made within the structure of church governance. By doing so, the court avoids two equally unacceptable departures from the genuine neutrality mandated by the First Amendment. First, it refrains from direct review and revision of decisions of the church on matters of religious doctrine and practice that underlie the church's determination of intrachurch controversies, including those that relate to control of church property.[5] Equally important, by recognizing the authoritative resolution reached within the religious association, the civil court avoids interfering indirectly with the religious governance of those who have formed the association and submitted themselves to its authority. See *supra*, at 612–614; *Watson* v. *Jones, supra,* at 728–729; *Kedroff* v. *Saint Nicholas Cathedral, supra,* at 107–110.

### III

Until today, and under the foregoing authorities, the first question presented in a case involving an intrachurch dispute over church property was where within the religious associa-

---

[5] Thus, in *Presbyterian Church* v. *Hull Church, supra,* the Court forbade the use of the "English approach" in the resolution of church property disputes because it requires the civil courts to determine whether authoritative decisions of doctrine and practice are consistent with the longstanding tenets of faith of a particular church. 393 U. S., at 449–450; accord, *Watson* v. *Jones,* 13 Wall., at 727–729. Similarly, in *Serbian Orthodox Diocese* v. *Milivojevich, supra,* the control of church property turned on the resolution of questions of doctrine and practice, "which under our cases is [only] for ecclesiastical and not civil tribunals." 426 U. S., at 709; see *id.,* at 720.

tion the rules of polity, accepted by its members before the schism, had placed ultimate authority over the use of the church property.[6] The courts, in answering this question have recognized two broad categories of church government. One is congregational, in which authority over questions of church doctrine, practice, and administration rests entirely in the local congregation or some body within it. In disputes over the control and use of the property of such a church, the civil courts enforce the authoritative resolution of the controversy within the local church itself. *Watson* v. *Jones, supra*, at 724–726. The second is hierarchical, in which the local church is but an integral and subordinate part of a larger church and is under the authority of the general church. Since the decisions of the local congregation are subject to review by the tribunals of the church hierarchy, this Court has held that the civil courts must give effect to the duly made decisions of the highest body within the hierarchy that has considered the dispute. As we stated in *Serbian Orthodox Diocese* v. *Milivojevich:*

> "[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution *requires* that civil courts accept their decisions as binding upon them." 426 U. S., at 724–725 (emphasis added).[7]

A careful examination of the constitutions of the general

---

[6] After answering this question, of course, the civil court must determine whether the dispute has been resolved within that structure of government and, if so, what decision has been made.

[7] Accord, *Kedroff* v. *Saint Nicholas Cathedral, supra*, at 113–114; *Watson* v. *Jones, supra*, at 727.

and local church, as well as other relevant documents, may be necessary to ascertain the form of governance adopted by the members of the religious association. But there is no reason to restrict the courts to statements of polity related directly to church property. For the constitutionally necessary limitations are imposed not on the evidence to be considered but instead on the object of the inquiry, which is both limited and clear: the civil court must determine whether the local church remains autonomous, so that its members have unreviewable authority to withdraw it (and its property) from the general church, or whether the local church is inseparably integrated into and subordinate to the general church.[8]

## IV

The principles developed in prior decisions thus afford clear guidance in the case before us. The Vineville church is presbyterian, a part of the PCUS. The presbyterian form of church government, adopted by the PCUS, is "a hierarchical structure of tribunals which consists of, in ascending order, (1) the Church Session, composed of the elders of the local church; (2) the Presbytery, composed of several churches in a geographical area; (3) the Synod, generally composed of all Presbyteries within a State; and (4) the General Assembly, the highest governing body." *Presbyterian Church* v. *Hull*

---

[8] See Kauper, Church Autonomy and the First Amendment: the Presbyterian Church Case, in Church and State: The Supreme Court and the First Amendment 90–92, 97–98 (P. Kurland ed. 1975). The Court suggests that the careful consideration of church constitutions and other relevant documents as a prerequisite to deciding basic questions of church polity may be impermissible if it requires a "searching . . . inquiry into church polity." *Ante,* at 605, quoting *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U. S., at 723. The issue in *Serbian Orthodox Diocese,* however, was quite different. There, the hierarchical polity of the church was clear. *Id.,* at 715–717. What the Court held impermissible was the state court's further inquiry into the faithfulness of the church hierarchy's decisions to the detailed provisions of church law. *Id.,* at 712–713, 718, 721–723; *id.,* at 725 (WHITE, J., concurring).

*Church,* 393 U. S., at 442. The Book of Church Order subjects the Session to "review and control" by the Presbytery in all matters, even authorizing the Presbytery to replace the leadership of the local congregation, to winnow its membership, and to take control of it. No provision of the Book of Church Order gives the Session the authority to withdraw the local church from the PCUS; similarly, no section exempts such a decision by the local church from review by the Presbytery.

Thus, while many matters, including the management of the church property, are committed in the first instance to the Session and congregation of the local church, their actions are subject to review by the Presbytery. Here, the Presbytery exercised its authority over the local church, removing the dissidents from church office, asserting direct control over the government of the church, and recognizing the petitioners as the legitimate congregation and Session of the church. It is undisputed that under the established government of the Presbyterian Church—accepted by the members of the church before the schism—the use and control of the church property have been determined authoritatively to be in the petitioners. Accordingly, under the principles I have thought were settled, there is no occasion for the further examination of the law of Georgia that the Court directs. On remand, the Georgia courts should be directed to enter judgment for the petitioners.