# IN THE SUPREME COURT OF TEXAS

════════════

No. 11-0265

════════════

THE EPISCOPAL DIOCESE OF FORT WORTH, ET AL., PETITIONERS,

v.

THE EPISCOPAL CHURCH, ET AL., RESPONDENTS

═══════════════════════════════════════════════════════════

ON DIRECT APPEAL FROM THE 141ST
DISTRICT COURT, TARRANT COUNTY, TEXAS

═══════════════════════════════════════════════════════════

**Argued October 16, 2012**

JUSTICE JOHNSON delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE GREEN, and JUSTICE GUZMAN joined, and in Parts I, II, III, and IV-A of which CHIEF JUSTICE JEFFERSON joined.

JUSTICE WILLETT filed a dissenting opinion, in which JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE DEVINE joined.

This direct appeal involves the same principal issue we addressed in *Masterson v. Diocese of Northwest Texas*, ___ S.W.3d ___ (Tex. 2013): what methodology is to be used when Texas courts decide which faction is entitled to a religious organization's property following a split or schism? In *Masterson* we held that the methodology referred to as "neutral principles of law" must be used. But, in this case the trial court granted summary judgment on the basis of the "deference" or "identity" methodology, and the record does not warrant rendition of judgment to either party based on neutral principles of law.

We reverse and remand to the trial court for further proceedings.

## I. Background

The Episcopal Church (TEC) is a religious organization founded in 1789. It has three structural tiers. The first and highest is the General Convention. The General Convention consists of representatives from each diocese and most of TEC's bishops. It adopts and amends TEC's constitution and canons. The second tier is comprised of regional, geographically defined dioceses. Dioceses are governed by their own conventions. Each diocese's convention adopts and amends its own constitution and canons, but must accede to TEC's constitution and canons. The third tier is comprised of local congregations. Local congregations are classified as parishes, missions, or congregations. In order to be accepted into union with TEC, missions and congregations must subscribe to and accede to the constitutions and canons of both TEC and the Diocese in which they are located.

In 1982 the Episcopal Diocese of Fort Worth (the Diocese or Fort Worth Diocese) was formed after the Episcopal Diocese of Dallas voted to divide into two parts. The Fort Worth Diocese was organized "pursuant to the Constitution and Canons of the Episcopal Church" and its convention adopted a constitution and canons. The Diocese's constitution provided that all property acquired for the Church and the Diocese "shall be vested in [the] Corporation of the Episcopal Diocese of Fort Worth." The canons of the Diocese provided that management of the affairs of the corporation "shall be conducted and administered by a Board of Trustees of five (5) elected members, all of whom are either Lay persons in good standing of a parish or mission in the Diocese, or members of the Clergy canonically resident in the Diocese." The Bishop of the Diocese was designated to serve

2

as chair of the board of the corporation. After adopting its constitution and canons the Diocese was admitted into union with TEC at TEC's December 1982 General Convention.

In February 1983, the Fort Worth Diocese filed articles of incorporation for the Fort Worth Corporation. That same year the Dallas and Fort Worth Dioceses filed suit in Dallas County and obtained a judgment transferring part of the Dallas Diocese's real and personal property to the Fort Worth Diocese. The 1984 judgment vested legal title of the transferred property in the Fort Worth Corporation, except for certain assets for which the presiding Bishop of the Dallas Diocese and his successors in office had been designated as trustee. The judgment transferred the latter assets to the Bishop of the Fort Worth Diocese and his successor in office as trustee.

Doctrinal controversy arose within TEC, leading the Fort Worth Corporation to file amendments to its articles of incorporation in 2006 to, in part, remove all references to TEC. The corporate bylaws were similarly amended. The 2007 and 2008 conventions of the Fort Worth Diocese voted to withdraw from TEC, enter into membership with the Anglican Province of the Southern Cone, and adopt amendments to the Diocese's constitution removing references to TEC.[1]

TEC responded. It accepted the renunciation of Jack Iker, Bishop of the Fort Worth Diocese, and TEC's Presiding Bishop removed Iker from all positions of authority within TEC. In February 2009, TEC's Presiding Bishop convened a "special meeting of Convention" for members of the Fort Worth Diocese who remained loyal to TEC. Those present at the meeting elected Edwin Gulick as Provisional Bishop of the Diocese and Chair of the Board of Trustees for the Fort Worth

---

[1] Three parishes in the Diocese did not agree with the actions and withdrew from the Diocese. The Fort Worth Corporation transferred property used by the withdrawing parishes to them.

3

Corporation. The 2009 Convention also voted to reverse the constitutional amendments adopted at the 2007 and 2008 Conventions and declared all relevant offices of the Diocese to be vacant. Bishop Gulick then appointed replacements to the offices declared vacant, including the offices of the Trustees of the Corporation. TEC recognized the persons elected at the 2009 Convention as the duly constituted leadership of the Diocese.

TEC, Rev. C. Wallis Ohls, who succeeded Bishop Gulick as Provisional Bishop of the Episcopal Diocese of Fort Worth, and clergy and lay individuals loyal to TEC (collectively, TEC) filed suit against The Episcopal Diocese of Fort Worth, the Fort Worth Corporation, Bishop Iker, the 2006 trustees of the corporation, and former TEC members (collectively, the Diocese), seeking title to and possession of the property held in the name of the Diocese and the Fort Worth Corporation.[2] Both TEC and the Diocese moved for summary judgment. A significant disagreement between the parties was whether the "deference" (also sometimes referred to as the "identity") or "neutral principles of law" methodology should be applied to resolve the property issue. TEC contended that pursuant to this Court's decision in *Brown v. Clark*, 116 S.W. 360 (Tex. 1909), the deference methodology has been applied in Texas for over a century and should continue to be applied. Under that methodology, it argued, TEC was entitled to summary judgment because it recognized Bishops Gulick and Ohls, the leaders elected at the 2009 convention, and the appointees of the Bishops as the true and continuing Episcopal Diocese. TEC also contended that even if the

---

[2] The defendants sought mandamus in the court of appeals regarding whether the attorneys for TEC had authority to file suit on behalf of the Corporation and the Diocese. *See In re Salazar*, 315 S.W.3d 279 (Tex. App.—Fort Worth 2010, orig. proceeding). The court of appeals conditionally granted mandamus relief, holding they did not. *Id.* at 285-86.

4

neutral principles methodology were applied, it would be entitled to summary judgment. The Diocese, on the other hand, contended that in *Brown* this Court effectively applied the neutral principles methodology without specifically calling it by that name, and Texas courts have continued to substantively apply that methodology to resolve property issues arising when churches split. Under the neutral principles methodology, the Diocese argued, it was entitled to summary judgment affirming its right to the property. The Diocese also maintained that even if the deference methodology were applied, it would still be entitled to summary judgment.[3]

The trial court agreed with TEC that deference principles should apply, applied them, and granted summary judgment for TEC. The Diocese sought direct appeal to this Court and we noted probable jurisdiction. We had previously granted the petition for review in *Masterson*, and we heard oral arguments for both cases on the same day.

## II. Jurisdiction

The Government Code provides that "[a]n appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX. GOV'T CODE § 22.001(c). The trial court granted summary judgment and issued injunctions ordering the defendants to surrender all Diocesan property and control of the Diocesan Corporation to the Episcopal Diocese of Fort Worth, and ordering the defendants to desist from holding themselves out as leaders of the Diocese. While

---

[3] The Diocese also asserts that we should dismiss certain tort claims TEC brought against individual defendants. The Diocese moved for summary judgment to dismiss these claims and argues that if we conclude the trial court erred in determining who was entitled to the property at issue, we should render the judgment the trial court should have rendered and dismiss the tort claims. Because of our disposition of the issue regarding who is entitled to the property, we do not address those claims.

5

the trial court order did not explicitly address the constitutionality of a statute, "[t]he effect of the trial court's order . . . is what determines this Court's direct appeal jurisdiction." *Tex. Workers' Compensation Comm'n v. Garcia*, 817 S.W.2d 60, 61 (Tex. 1991).

In its motion for summary judgment TEC argued, in part, that the actions of the Board of Trustees in amending the Fort Worth Corporation's articles of incorporation were void because the actions went beyond the authority of the corporation, which was created and existed as an entity subordinate to a Diocese of TEC. TEC argued that "[t]he secular act of incorporation does not alter the relationship between a hierarchical church and one of its subordinate units" and that finding otherwise "would risk First Amendment implications." The Diocese, on the other hand, argued that the case was governed by the Texas Non-Profit Corporation Act[4] and the Texas Uniform Unincorporated Nonprofit Association Act[5]; under those statutes a corporation may amend its articles of incorporation and bylaws; and TEC had no power to limit or disregard amendments to the Corporation's articles and bylaws.

In its summary judgment order the trial court cited cases it said recognized "that a local faction of a hierarchical church may not avoid the local church's obligations to the larger church by amending corporate documents or otherwise invoking nonprofit corporations law." The trial court substantively ruled that because the First Amendment to the United States Constitution deprived it of jurisdiction to apply Texas nonprofit corporation statutes, applying them to determine the parties' rights would violate Constitutional provisions. The court's injunction requiring defendants to

---

[4] TEX. REV. CIV. STAT. arts. 1396-1.01 to 1396-11.02

[5] TEX. REV. CIV. STAT. art. 1396-70.01

6

surrender control of the Fort Worth Corporation to the Episcopal Diocese of Fort Worth was based on that determination. The effect of the trial court's order and injunction was a ruling that the Non-Profit Corporation Act would violate the First Amendment if it were applied in this case. Accordingly, we have jurisdiction to address the merits of the appeal.

### III. "Deference" and "Neutral Principles"

In *Masterson* we addressed the deference and neutral principles methodologies for deciding property issues when religious organizations split. ___ S.W.3d at ___. Without repeating that discussion in full, suffice it to say that generally courts applying the deference approach to church property disputes utilize neutral principles of law to determine where the religious organization has placed authority to make decisions about church property. *See Jones v. Wolf*, 443 U.S. 595, 603-04 (1979). Once a court has made this determination, it defers to and enforces the decision of the religious authority if the dispute has been decided within that authority structure. *Id.* But courts applying the neutral principles methodology defer to religious entities' decisions on ecclesiastical and church polity issues such as who may be members of the entities and whether to remove a bishop or pastor, while they decide non-ecclesiastical issues such as property ownership and whether trusts exist based on the same neutral principles of secular law that apply to other entities. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09 (1976). We concluded in *Masterson* that the neutral principles methodology was the substantive basis of our decision in *Brown v. Clark*, 116 S.W. 360 (Tex. 1909), and that Texas courts should utilize that methodology in determining which faction of a religious organization is entitled to the property when the organization splits. ___ S.W.3d at ___. We also concluded that even though both the deference and neutral principles

7

methodologies are constitutionally permissible, Texas courts should use only the neutral principles methodology in order to avoid confusion in deciding this type of controversy. *Id.*

## IV. Application

### A. Summary Judgment—Deference

Based on our decision in *Masterson*, we hold that the trial court erred by granting summary judgment to TEC on the basis of deference principles. ___ S.W.3d at ___.

### B. Summary Judgment—Neutral Principles

TEC asserts that application of neutral principles may violate free-exercise protections if, for example, the Diocese is permitted to void its commitments to church laws because the specific formalities of Texas law governing trusts were not followed or if they are applied retroactively. *See Jones*, 443 U.S. at 606 (noting that the case did not "involve a claim that retroactive application of a neutral-principles approach infringes free exercise rights"). But TEC recognizes that whether application of the neutral principles approach is unconstitutional depends on how it is applied. *See id.* at 606 ("It remains to be determined whether the Georgia neutral-principles analysis was constitutionally applied on the facts of this case."). Because neutral principles have yet to be applied in this case, we cannot determine the constitutionality of their application. Further, TEC does not argue that application of procedural matters such as summary judgment procedures and burdens of proof are unconstitutional. Thus, we address the arguments of the parties regarding who is entitled to summary judgment pursuant to neutral principles and conclude that neither TEC nor the Diocese is. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (noting that when both parties move for summary judgment and the trial court grants one

8

motion and denies the other, appellate courts consider the summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered).

Under the neutral principles methodology, ownership of disputed property is to be determined by considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and bylaws, if any), and relevant provisions of governing documents of the general church. *E.g.*, *Jones*, 443 U.S. at 602-03; *see Presbyterian Church v. E. Heights*, 167 S.E.2d 658, 659-60 (Ga. 1969). TEC points out that deeds to the properties involved were not part of the summary judgment record when the trial court ruled. Thus, TEC argues, if we do not sustain the summary judgment in its favor, we should remand the case so the trial court may consider the record on the basis of neutral principles and the four factors referenced in *Jones*: (1) governing documents of the general church, (2) governing documents of the local church entities, (3) deeds, and (4) state statutes governing church property. *See Jones*, 443 U.S. at 602-03. We agree that the case must be remanded for further proceedings under neutral principles.

Although deeds to the numerous properties involved were not before the trial court when it granted summary judgment, the Diocese asserts that there is no dispute about its holding title to and having control of the properties. But TEC disagrees with that position. And absent agreement or conclusive proof of title to the individual properties and the capacities in which the titles were taken, fact questions exist under neutral principles of law, at a minimum, about who holds title to each

property and in what capacity.[6]  Accordingly, we cannot render judgment on the basis of neutral principles.

## C.  Remand

Because the trial court must apply neutral principles on remand, for its guidance we address certain arguments made by the parties relating to that methodology.  *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997) ("Although resolution of this issue is not essential to our disposition of this case, we address it to provide the trial court with guidance in the retrial . . . .").

We first note that on remand the trial court is not limited to considering only the four factors listed in *Jones*.  As we said in *Masterson*, *Jones* did not purport to establish a federal common law of neutral principles to be applied in this type of case.  ___ S.W.3d at ___.  Rather, the elements listed in *Jones* are illustrative.  If it were otherwise and courts were limited to applying some, but not all, of a state's neutral principles of law in resolving non-ecclesiastical questions, religious entities would not receive equal treatment with secular entities.  We do not believe the Supreme Court intended to say or imply that should be the case.

Next we address the Diocese's argument that under neutral principles courts do not defer to TEC's decisions about non-ecclesiastical matters such as the identity of the trustees of the Fort Worth Corporation.  The Diocese argues that under the Non-Profit Corporation Act the trustees are the 2006 trustees who are named as defendants in this suit.  TEC responds that the trustees are

---

[6] Deeds filed after the trial court granted summary judgment were dated both before and after the 1984 judgment transferring properties from the Dallas Diocese.  The deeds dated after the judgment reflect various grantees.  Some properties were deeded to the Fort Worth Corporation or local entities, while others were deeded in trust to the Corporation, local entities, or various other persons and entities.

required by the corporate bylaws to be lay persons in "good standing," the Diocese rules require them to be loyal Episcopalians, and the bylaws provide that trustees do not serve once they become disqualified. Those determinations, TEC argues, were made by Bishops Gulick and Ohls and the 2009 convention, and courts must defer to those determinations because they are ecclesiastical decisions.

While we agree that determination of who is or can be a member in good standing of TEC or a diocese is an ecclesiastical decision, the decisions by Bishops Gulick and Ohls and the 2009 convention do not necessarily determine whether the earlier actions of the corporate trustees were invalid under Texas law. The corporation was incorporated pursuant to Texas corporation law and that law dictates how the corporation can be operated, including determining the terms of office of corporate directors, the circumstances under which articles and bylaws can be amended, and the effect of the amendments. *See* TEX. BUS. ORG. CODE §§ 22.001–.409. We conclude that this record fails to show that, as a matter of law, the trustees had been disqualified from serving as corporate trustees at the relevant times. Nor does the record conclusively show whether the 2009 appointments to the corporation board by Bishop Ohl were valid or invalid under Texas law, or whether, under Texas law, the actions taken by the trustees appointed by Bishop Ohl in 2009 were valid or invalid.

Third, the Diocese argues that TEC has no trust interest in the property. TEC Canon I.7.4, also known as the Dennis Canon, provides:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or

11

Congregation remains a part of, and subject this Church and its Constitution and Canons.

The Diocese asserts that this canon does not create a trust under Texas law, but that even if it does, it was revocable and the Diocese revoked it when the Diocesan canons were amended to state:

> Property held by the Corporation for the use of a Parish, Mission or Diocesan School belongs beneficially to such Parish, Mission or Diocesan School only. No adverse claim to such beneficial interest by the Corporation, by the Diocese, or by The Episcopal Church of the United States of America is acknowledged, but rather is expressly denied.

TEC counters that the Dennis Canon creates a trust because the corporation acceded to it and the Diocese could not have adopted a canon revoking the trust. TEC also asserts that the statutes applicable to charitable trusts apply, but if they do not, a resulting trust or other trust may be applied here because the history, organization, and governing documents of the Church, the Diocese, and the parish support implication of a trust. The Diocese responds to TEC's arguments by referencing Texas statutory law requiring a trust to be in writing and providing that trusts are revocable unless they are expressly made irrevocable. *See* TEX. PROP. CODE § 112.004, .051. These issues were not addressed by the trial court because it granted summary judgment based on deference principles. Upon remand the parties will have the opportunity to develop the record as necessary and present these arguments for the trial court to consider in determining the rights of the parties according to neutral principles of law. But regarding the trial court's consideration of the issue, we note that in *Masterson* we addressed the Dennis Canon and Texas law. There we said that even assuming a trust was created as to parish property by the Dennis Canon and the bylaws and actions of a parish non-profit corporation holding title to the property, the Dennis Canon "simply does not contain language

12

making the trust *expressly* irrevocable.... Even if the Canon could be read to imply the trust was irrevocable, that is not good enough under Texas law. [Texas Property Code § 112.051] requires *express* terms making it irrevocable." *Masterson*, ___ S.W.3d at ___.

Finally, as to the argument that application of neutral principles may pose constitutional questions if they are retroactively applied, we note that over a century ago in *Brown v. Clark*, 116 S.W. 360 (Tex. 1909), our analysis and holding substantively reflected the neutral principles methodology.

## V. Conclusion

We reverse the judgment of the trial court and remand the case to that court for further proceedings consistent with this opinion.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** August 30, 2013

13