NIEMANN, Admr., et al., Appellees,

v.

COOLEY et al., Appellants.

[Cite as *Niemann v. Cooley* (1994), 93 Ohio App.3d 81.]

Court of Appeals of Ohio,
Hamilton County.

Nos. C–920470 and C–920457.

Decided Jan. 26, 1994.

*G. Ernie Ramos,* for appellees.

*McIntosh, McIntosh & Knabe* and *Thomas A. Mack,* for appellant George Cooley.

*Dinsmore & Shohl, Mark A. VanderLaan* and *David K. Mullen,* for appellants Guardian Angels School, Guardian Angels Parish, and the Archdiocese of Cincinnati.

MARIANNA BROWN BETTMAN, Judge.

These appeals arise out of a discovery dispute. The plaintiffs-appellees, Robert and Sharyn Niemann, are the parents of Eric Niemann, who died in an automobile accident. Subsequent to his death, they filed an action as personal representatives of their son's estate, alleging damages for pain and suffering and emotional distress resulting from a sexual assault on Eric in 1984 by defendant George Cooley ("Father Cooley") while he was associate pastor at Guardian Angels Parish in Cincinnati. In addition to Father Cooley, the Niemanns named as defendants Guardian Angels School, Guardian Angels Parish, and the Archdiocese of Cincinnati ("the Archdiocese" and, collectively, "the Archdiocesan defendants"), alleging that they were responsible for Father Cooley's actions on various theories of *respondeat superior*, negligent hiring and employment, and negligent supervision.

In pursuing discovery in the lawsuit, the Niemanns posed certain interrogatories and document requests to Father Cooley and to the Archdiocesan defendants. In answering interrogatories specifically directed to him, Father Cooley acknowledged that in 1979 he had been involved in an incident involving sexual contact with a minor boy that had resulted in a complaint to the priest personnel director, for which he subsequently received regular counseling due to the incident. He further stated that he could not recall the name of his counselor but that "he was a psychologist provided by a counseling service of the Archdiocese." In response to a request to produce "health records, including physical and emotional examinations, treatment and counseling" while he was under the supervision of the Archdiocese, Father Cooley stated that, while he did not possess such records, "[i]f there are any they have been provided by [*sic*] the Archdiocese."

The Archdiocesan defendants were asked to identify "each and every" psychologist, doctor, psychiatrist "or other health provider" who had treated Father Cooley since 1970, and to provide dates for such treatment. The Archdiocesan defendants refused to provide such information on the basis of relevance and the physician-patient privilege. In response to another interrogatory, the Archdiocesan defendants stated that they were aware of the 1979 incident involving Father Cooley and that the matter had been referred to the Office of Priest Personnel "for investigation." The Archdiocesan defendants further stated that "[a]s a result of this investigation, Cooley was required to receive regular and ongoing counseling."

Also during the course of discovery, the Niemanns learned that the Archbishop of Cincinnati had caused to be created a canon law archive ("the secret archive

file") for Father Cooley. The Niemanns sought discovery of this secret archive file and the Archdiocesan defendants refused to produce it.

The Niemanns thereafter filed a motion to compel discovery in which their counsel stated that Father Cooley had refused to sign a medical release authorizing them to receive those communications [1] he had allowed his "psychiatrist and counselors" to share with the Archdiocese of Cincinnati. Arguing that Father Cooley had waived any privilege with respect to these documents by sharing them with the Archdiocese, the Niemanns asked that the court issue an order compelling the defendants to produce the documents for inspection. In opposing this motion, Father Cooley argued that the communications sought by the Niemanns were protected by the physician-patient privilege, and that he had not waived this privilege. In opposing the same motion, the Archdiocesan defendants also argued that the communications requested by the Niemanns were protected by the physician-patient privilege, and that Father Cooley had not waived the privilege in allowing the Archdiocese to receive these communications, because they were received "in the course of the ongoing pastoral relationship between Cooley as an ordained priest of the Roman Catholic Church and his spiritual advisors." While the Archdiocesan defendants alluded to the clergy privilege in this manner, they did not directly assert this privilege as a separate ground for opposing the motion to compel. The Archdiocesan defendants supplementally argued that the documents sought by the Niemanns were protected by the First Amendment to the United States Constitution because they were kept in "secret archives" protected by canon law.

A hearing was held on the matter, following which the trial court entered an order granting the Niemanns' motion to compel. Specifically, the trial court found that Father Cooley had waived the physician-patient privilege regarding those communications which he authorized between his mental health providers and the Archdiocese. Therefore, in that part of the order which we will refer to as the "direct turn over order," the trial court ordered Father Cooley [2] to produce

---

**1.** Throughout this opinion we will use the term "communication" as it is used in R.C. 2317.02(B)(3). We also intend to include both verbal and written communications within this definition.

**2.** The trial court's order logically divides into two parts: that part of the order requiring that the communications be directly turned over to the Niemanns, and that part of the order which requires the Archdiocese to submit the secret archive file to an *in camera* inspection. That part of the order which requires that the communications be directly turned over to the Niemanns is directed toward the "defendant," singular, which we interpret for purposes of this decision to mean Father Cooley. The court appears to have written first "defendants," plural, but later obliterated the "s". Although we interpret the court's order in this manner, nothing in this decision should be construed as limiting the trial court's authority to clarify its own order on remand.

for the Niemanns "all communications and writings setting forth the date and content of any verbal communications or summaries thereof, from George Cooley's psychologists, psychiatrists, counselors or other mental health providers to the Archdiocese of Cincinnati or employees or agents of the Archdiocese of Cincinnati." Furthermore, in that part of the order which we will refer to as the "*in camera* inspection order," the trial court ordered the Archdiocese to produce for an *in camera* inspection by the court the "confidential/secret archive file" relating to Father Cooley exclusive of any communications between the Archdiocesan defendants and their attorneys. It is from this order that Father Cooley and the Archdiocesan defendants have filed separate appeals.

These appeals present two difficulties. One has to do with finality of the order appealed from; the other involves the state of the record before this court. We will address each in turn.

## I

Subsequent to the briefing and oral arguments in this case, the Ohio Supreme Court handed down two decisions, *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 616 N.E.2d 213, and *Bell v. Mt. Sinai Med. Ctr.* (1993), 67 Ohio St.3d 60, 616 N.E.2d 181, which substantially affect the determination of what constitutes a final appealable order under the special-proceeding prong of R.C. 2505.02. The parties were thus given an opportunity to address this issue in supplemental briefs in light of these decisions. For the reasons which follow, we hold that the direct turn over order from which Father Cooley appeals is final and appealable, but that the *in camera* inspection order from which the Archdiocesan defendants appeal is not.

In order to understand our holding, we must review the decisions in both *Polikoff* and *Bell,* and also the decisions in *State v. Port Clinton Fisheries, Inc.* (1984), 12 Ohio St.3d 114, 12 OBR 157, 465 N.E.2d 865, and *Humphry v. Riverside Methodist Hosp.* (1986), 22 Ohio St.3d 94, 22 OBR 129, 488 N.E.2d 877.

The holding of *Polikoff,* as stated in its syllabus, is as follows:

"Orders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02. (*Amato v. Gen. Motors Corp.* [1981], 67 Ohio St.2d 253, 21 O.O.3d 158, 423 N.E.2d 452, overruled.)"

*Amato,* which the syllabus in *Polikoff* expressly overrules, had established a standard balancing test to be applied to determine whether an action arose in a special proceeding. That test weighed the harm to judicial economy resulting from the allowance of an immediate appeal against the risk of irreparable harm should review be held in abeyance until after final judgment. While both *Port*

*Clinton Fisheries* and *Humphry* do use the *Amato* balancing test expressly rejected by *Polikoff, Bell* acknowledges that both of those cases also separately and independently recognized that there is something in the nature of an order compelling disclosure of confidential or privileged material which requires immediate relief because the harm caused by the disclosure order cannot be corrected upon appeal. *Bell,* 67 Ohio St.3d at 65, 616 N.E.2d at 184; see *Humphry,* 22 Ohio St.3d at 97, 22 OBR at 131, 488 N.E.2d at 879; *Port Clinton Fisheries, Inc.,* 12 Ohio St.3d at 116, 12 OBR at 159, 465 N.E.2d at 867–868. Accord *Calihan v. Fullen* (1992), 78 Ohio App.3d 266, 604 N.E.2d 761. As stated in *Bell,* "an order which affects a substantial right has been perceived to be one which if not immediately appealable would foreclose appropriate relief in the future." 67 Ohio St.3d at 63, 616 N.E.2d at 184.

In *Bell,* which was issued on the same day as *Polikoff,* the court dealt with the appealability under R.C. 2505.02 of a discovery order compelling the submission of allegedly privileged information to an *in camera* inspection. After determining that the action for prejudgment interest was a special proceeding because of its statutory origin, the court in *Bell* proceeded to discuss whether the order affected a substantial right under R.C. 2505.02. Although conceding that the appellants' assertion of the attorney-client privilege clearly involved a substantial right, the court held that the right was nonetheless not affected for the purposes of R.C. 2505.02 by merely subjecting the materials to *in camera* review to determine their discoverability. As the *Bell* court noted, if the trial court found none of the materials to be discoverable, then any issues which may have been the subject of an interlocutory appeal would be rendered moot. However, if, after an *in camera* inspection, some of the documents were determined to be subject to disclosure, the court stated that "an appeal on narrowed issues would be available" pursuant to its decisions in *Humphry* and *Port Clinton Fisheries, Inc., supra,* because at that point a substantial right would be affected.

In applying *Polikoff* and *Bell* to the appeals before us, we must first determine whether the order appealed from was made in a special proceeding. According to *Polikoff,* if an order was entered in an action that was recognized at common law or in equity and not created by statute, then the order is not one made in a special proceeding. If we apply this test as the Niemanns urge us to do, merely by looking at the underlying cause of action in this case, essentially one of common-law assault and negligence, then the test for a special proceeding would not be met and no interlocutory appeals would be allowed in this case. We concede that in *Bell* the court, without discussion, looked to the underlying nature of the action, actually a motion for prejudgment interest, to apply the test. However, we agree with our colleagues in the Second Appellate District in *Stevens v. Grandview Hosp. & Med. Ctr.* (Oct. 20, 1993), Montgomery App. No.

14042, unreported, 1993 WL 420127, that the syllabus of *Polikoff* should not be read in so sweeping a fashion "that it renders all orders in suits that were recognized at common law as not being final appealable orders." *Id.* at 2. To demonstrate the anomaly of such a reading, if an order compelling disclosure of privileged material were made in a wrongful death action, which is statutory, it would be made in a special proceeding, but the same order in a common-law negligence action would not be. To read *Polikoff* so broadly would, we believe, compel us to cast aside completely the reasoning and important public policy concerns that underlay such decisions as *Humphry, Port Clinton,* and *Calihan, supra.* Like the court in *Grandview,* we trust that the Ohio Supreme Court will eventually resolve these matters.

Therefore, until it receives further clarification by the Ohio Supreme Court, we read *Polikoff* to mean that it is the nature of the privilege, not the underlying cause of action, which must be examined in the case before us. All the privileges asserted are statutory and hence we conclude that the order appealed from is one made in special proceeding for the purposes of R.C. 2505.02.

██  Having determined that the order appealed from was entered in a special proceeding, we have not completed our jurisdictional analysis. We must still determine whether a substantial right is affected by the order compelling the production of the communications. This involves the application of *Bell* to this case. As to Father Cooley, the court ordered that he turn over directly to the Niemanns those communications he authorized his counselors to share with the Archdiocese. Father Cooley has asserted the statutory physician-patient privilege. That privilege is immediately threatened by the ordered direct disclosure to the Niemanns, since if privileged material is erroneously ordered turned over there is no way to undo the harm. In the words of *Bell,* it is an order which "if not immediately appealable would foreclose appropriate relief in the future." *Bell,* 67 Ohio St.3d at 63, 616 N.E.2d at 184. We therefore hold that a substantial right is affected by the direct turn over order, and that the order from which Father Cooley appeals is final and appealable.

██  The finality of the *in camera* inspection order, from which the Archdiocesan defendants appeal, presents different problems and the further application of *Bell.* First of all, we note that the physician-patient privilege is personal to Father Cooley, and the Archdiocesan defendants have no standing to assert it. The Archdiocesan defendants attempt to assert on appeal a clergy privilege in addition to Father Cooley's physician-patient privilege, and argue that on this basis the trial court's order affects a substantial right of theirs. They argue that Father Cooley only allowed the communications from his mental health counselors to be shared with them "in the course of the ongoing pastoral relationship between Cooley as an ordained priest of the Roman Catholic Church and his

spiritual advisors," in other words, as penitent to priest. The trouble with this argument is that the record does not establish that the communications sought by the Niemanns are confessional or in the nature of "religious counseling," as is required for the clergy privilege to apply. See R.C. 2317.02; *Radecki v. Schuckardt* (1976), 50 Ohio App.2d 92, 4 O.O.3d 60, 361 N.E.2d 543; *In re Soeder* (1966), 36 Ohio App.2d 271, 7 O.O.2d 404, 220 N.E.2d 547. Furthermore, the Archdiocesan defendants did not directly assert the clergy privilege before the trial court, referring to it only once in their memorandum opposing the motion to compel, and then only as secondary support for their argument that Father Cooley had not waived the physician-patient privilege by sharing his counseling records with his religious superiors. It is well settled that matters never raised or ruled on in the trial court are not properly considered on appeal. See *Manes v. Espy* (Oct. 31, 1979), Hamilton App. No. C–77724, unreported, citing *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629.

We must perform one more analysis to determine whether the *in camera* inspection order is final and appealable. Pursuant to *Bell*, it is absolutely clear that an order merely requiring submission of allegedly privileged materials to an *in camera* inspection does not affect a substantial right since at that point the court has not ordered any materials disclosed.[3] The Archdiocesan defendants seek to distinguish *Bell*, however, by arguing that in this case even such a limited order not only involves but immediately affects a substantial right, in fact a constitutional right. By requiring the Archdiocese to produce such documents for inspection, these defendants argue, the court is compelling the Archbishop to violate canon law, specifically Canons 488, 489, and 490, thus violating the Archdiocese's First Amendment rights by excessively entangling the state in the affairs of the Roman Catholic Church.

We disagree. We read these canons as dealing with how the church chooses to handle the secret archive file administratively. For example, Canon 489 calls for the destruction of documents of criminal cases in matters of morals where the criminal has died or ten years have passed. Were we to decide whether that canon is fair, or whether it comports with our civil view of due process, or were we to decide the merits of disciplinary action, if any, taken by the Archdiocese against Father Cooley, we would be clearly stepping over the line of involvement in the ecclesiastical affairs of the church. As early as 1871 in *Watson v. Jones* (1871), 80 U.S. (13 Wall.) 679, 20 L.Ed. 666, the United States Supreme Court upheld the command of the First Amendment not to interfere in disputes concerning religious doctrine, discipline, faith, or internal organization. Accord

---

**3.** *Bell* speaks about witnesses not parties. We see no distinction for the purposes of this analysis between a witness and a party defendant, both being involuntary participants in a lawsuit.

*Jones v. Wolf* (1979), 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775; *Serbian Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151. See, also, *Hutchison v. Thomas* (C.A.6, 1986), 789 F.2d 392 (civil court had no jurisdiction to determine whether the United Methodist Church wrongfully expelled reverend from his ministry); *Salzgaber v. First Christian Church* (1989), 65 Ohio App.3d 368, 583 N.E.2d 1361 (civil court had no jurisdiction over claims of wrongful termination brought by former co-pastors of church); and *Alexander v. Shiloh Baptist Church* (1991), 62 Ohio Misc.2d 79, 592 N.E.2d 918 (members of congregation threatened with termination of their membership denied preliminary injunction because Constitution prohibits secular courts from resolving disputes over who can be a member of a particular church).

However, we find nothing in the discovery rules promulgated by the Ohio Supreme Court, or the order of the trial judge in this case for an *in camera* inspection, which interferes with or entangles the state in the rights to believe and practice the religion of one's choice, which are the freedoms protected by the First Amendment. We find ourselves in agreement with the Pennsylvania court in *Hutchison v. Luddy* (1992), 414 Pa.Super. 138, 606 A.2d 905, appeal withdrawn (1992), 531 Pa. 640, 611 A.2d 712, which, when confronted with the same arguments concerning the secret archive files of the Catholic Church, stated:

"Merely because Canon 489 is controlling in the internal operations of the affairs of the Church does not mean that it permits evidence pertaining to sexual molestation of children by priests to be secreted and shielded from discovery which is otherwise proper * * *." *Id.*, 414 Pa.Super. at 145, 606 A.2d at 908.

"Free exercise of religion, as it its encapsulated in the First Amendment, embraces two concepts—freedom to believe and freedom to act. The first is absolute, but the second remains subject to regulations for the protection of society. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). We are not concerned here with the former; [the appellant] and other congregation members remain unimpeded in the cerebral sphere. The sole issue is whether the Church may refrain from producing documents under a narrowed court order. There is no doubt that this constitutes conduct. *United States v. Holmes*, 614 F.2d 985, 989 (5th Cir.1980). Decisions expressing judicial reluctance to become entangled in internal church affairs are also inapplicable. Those cases are premised on a perceived danger that in resolving intra-church disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. [Citations omitted.] Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization * * *. *General Council on Finance and Administration of the United Methodist Church v. Superior Court of California*, 439 U.S. 1369, 1373, 99

S.Ct. 35 [38], 58 L.Ed.2d 77, 81–82 (1978) (Rehnquist, J.)." *Id.*, 414 Pa.Super. at 149, 606 A.2d at 910–911.

Furthermore, we note that R.C. 2151.421 creates a statutory reporting requirement in cases of suspected or known child abuse or neglect. Significant to our analysis is that included in the list of counselors expressly required to report such abuse are "person(s) rendering spiritual treatment through prayer in accordance with the tenets of a well-recognized religion, who is acting in his official or professional capacity * * *." R.C. 2151.421(A)(1). The reporting must be made to one of a listed group of clearly secular agencies. There is no exception in the statute for communications made as penitent to a clergy member as there are for communications made from patient to physician or client to attorney. We read from this statute a strong and clear legislative intent that the church is to yield to the state on issues such as these.

Accordingly, we hold that the Archdiocesan defendants have failed to demonstrate that any substantial right of theirs is affected by the court's order for an *in camera* inspection of the secret archive file. The appeal of the Archdiocesan defendants, No. C–920457, is therefore dismissed, and the Archdiocese shall comply with the order of the trial court for an *in camera* inspection of its secret archive file pertaining to Father Cooley.

## II

We turn now to the merits of Father Cooley's appeal. In his sole assignment of error, Father Cooley asserts that the trial court erred to his prejudice by ordering the release of privileged communications. We would be remiss in our analysis if we did not emphasize that the state of the record before us is so sketchy that meaningful review is very limited. If Father Cooley's deposition was taken it was not filed, and thus is not part of the record. The only deposition which is of record is that of Rev. Conlon, Chancellor of the Archdiocese and head of its legal affairs. Furthermore, much arguing has occurred about the communications which are the subject both of the direct turn over order and the *in camera* inspection, but nowhere is there a list of the dates and documents so that all parties and the court actually know what documents are being argued about. For example, the Niemanns posited the following interrogatory to Father Cooley:

"Identify all records, documents or other physical exhibits, whether public or private, wherever located including in any secret archive, which related to the employment, conduct, health treatment, complaints about, assaults by and sexual activity of defendant George Cooley."

■ Father Cooley's response was "none available," which is clearly nonresponsive. It is perfectly proper and, in fact, desirable for meaningful review of discovery disputes, for the party asserting the privilege to identify in a general way each item or category of materials sought to be protected, listing next to each the exact privilege being relied on.

Although relying primarily on the physician-patient privilege, Father Cooley also asserts in his appeal that the communications are protected by the clergy privilege. Nowhere in the record, however, do we find that Father Cooley asserted the clergy privilege before the trial court and therefore the applicability of the clergy privilege is not properly before this court. See *Manes v. Espy* and *Stores Realty Co. v. Cleveland, supra.* Moreover, even if this issue were properly before us, as we noted previously, there is nothing in the record to support the proposition that these communications were confessional or for religious counseling.

The paucity and lack of specificity in the record again impede us in our attempt to analyze the merits of Father Cooley's assertion of the physician-patient privilege. The only indication in the record of the type of professional counselor Father Cooley visited is contained in his answer to an interrogatory, in which he states that he could not recall the name of his counselor but that "he was a psychologist provided by the counseling services of the Archdiocese." In his brief, Father Cooley refers to a psychologist and psychiatrist. Beyond these vague statements there is nothing in the record which establishes the identity of the mental health care providers or their licensure, educational background or certification.

■ Before turning to our holding on the merits of Father Cooley's appeal, we need to review the differences in the privileges which attach to a patient or client, depending on the kind of treatment sought. We also go through this review to assist the trial court in its *in camera* inspection of the secret archive file. R.C. 2713.02(B) creates a doctor-patient privilege which would be applicable to a psychiatrist. R.C. 4732.19 governs the psychologist-client relationship, which is given the same privilege as that of physician and patient. R.C. 2317.02(G)(1) creates a privilege for communications to social workers or counselors licensed under R.C. Chapter 4757. However, unlike the doctor-patient and psychologist-client privileges, R.C. 2317.02(G)(1) expressly affords no privilege to communications involving a social worker which indicate a "clear and present danger to the client or other person." A "clear and present danger" is defined to include indications of present or past child abuse. R.C. 2317.02(C)(1)(a).

Furthermore, it is essential to any determination of these privileges to know the nature and purpose of the professional help sought. R.C. 2713.02(B) protects communications made by a patient to a medical doctor "in that relation." "Communication" is defined as "acquiring, recording, or transmitting any infor-

mation, in any manner, concerning any facts, opinions, or statements necessary to enable a physician (or dentist) to *diagnose, treat, prescribe, or act for a patient.*" (Emphasis added.)  R.C. 2317.02(B)(3).  As we noted in *Wozniak v. Kombrink* (Feb. 13, 1991), Hamilton App. No. C–890531, unreported, 1991 WL 17213, since the physician-patient privilege is in derogation of the common law, Ohio courts have strictly construed it to afford protection only to those relationships enumerated in the statute, meaning only to those instances in which medical treatment was sought.  Hence, if the medical examination is for another purpose, such as a physical examination made by company doctors to determine employability, the privilege does not attach.  *Id.;* see, also, *Suetta v. Carnegie–Illinois Steel Corp.* (App.1955), 75 Ohio Law Abs. 487, 144 N.E.2d 292; *McMillen v. Indus. Comm.* (App.1941), 34 Ohio Law Abs. 435, 37 N.E.2d 632; *New York Cent. Rd. Co. v. Wiler* (1931), 124 Ohio St. 118, 177 N.E. 205.  In *Wiler,* for example, an examination by a company physician "to inform the company of the physical condition of the [examinee], to enable the company to intelligently determine whether it could safely and profitably continue him as one of its employees" was not considered privileged.  *Id.* at 122, 177 N.E. at 206.

With this analysis as a backdrop, we return to the sparse record which we have in this case.  The Archdiocesan defendants in their answers to interrogatories indicated that, as a result of the 1979 incident of sexual misconduct, Father Cooley was "required to receive regular and ongoing counseling."  The only additional information concerning this counseling is contained in the deposition of Father Conlon, Chancellor of the Archdiocese, who testified that normally when a priest was investigated for sexual misconduct he was expected to receive a psychological evaluation so that the case could be "evaluated" to determine "what our response would be."  Father Cooley's deposition, if taken, may have provided a source of much valuable detail concerning his counseling but such deposition, if it exists, is not part of the record.

Thus, while Father Cooley's answers to interrogatories suggest that his counseling may have been for treatment, Father Conlon's deposition testimony suggests that his counseling visits may have been, in whole or in part, a psychological evaluation required by the Archdiocese for the narrow purpose of determining the church's response to Cooley's sexual misconduct.

This distinction is crucial.  If Father Cooley was in counseling with a psychiatrist or psychologist for the purposes of treatment, those communications would be privileged unless expressly waived.  R.C. 2317.02(B)(1)(a).  Moreover, the circumstances leading to a waiver are to be strictly construed.  *In re Miller* (1992), 63 Ohio St.3d 99, 585 N.E.2d 396.  On the other hand, if Father Cooley's counseling with a psychologist or psychiatrist was not for treatment, but, rather, for the Archdiocese to determine his future as a priest or how it intended to handle his problems, then the records are not privileged and it is incorrect to

speak of a waiver. No issue of waiver arises because there is no protected material involved. Also, if Father Cooley saw a social worker or other counselor licensed under R.C. Chapter 4757 for either treatment or evaluation, and the communications involved indications of present or past child abuse, those communications are not privileged.

It is well settled that the appellant has the burden of presenting a record exemplifying the error of which he complains. *Wilson v. Wilson* (Nov. 2, 1983), Hamilton App. No. C–820927, unreported, 1983 WL 5295. We hold that Father Cooley has failed to demonstrate that the trial court erred when it granted the Niemanns' motion to compel discovery of those communications which Father Cooley allowed to be shared between his mental health providers and the Archdiocesan defendants. We note that the trial court, in its reasoning, verbally determined in the hearing on the motion that these communications were not privileged, while in its judgment entry the trial court found an express waiver of the privilege. Based on the state of the record, we believe that there is insufficient evidence from which the trial court could have determined that there was an express waiver. However, we hold that there is a sufficient basis in the record for the trial court to have determined that the communications which Father Cooley allowed to be shared with the Archdiocese were ordered by the Archdiocese for its own use, and, thus, were not privileged. Accordingly, Father Cooley's sole assignment of error is overruled and the judgment of the trial court granting the Niemanns' motion to compel discovery is affirmed.

*Judgment accordingly.*

KLUSMEIER, P.J., and DOAN, J., concur.