IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-98

No. 390A21

Filed 19 August 2022

NATION FORD BAPTIST CHURCH INCORPORATED d/b/a Nations Ford
Community Church, Plaintiff

v.

PHILLIP RJ DAVIS, Defendant / Third-Party Plaintiff

v.

JOSEPH DIXON, CHARLES ELLIOT and DOUGLAS WILLIE, Third-Party
Defendants

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 279 N.C. App. 599, 2021-NCCOA-528, affirming an order entered on 22 July 2020 by Judge Carla N. Archie in Superior Court, Mecklenburg County. Heard in the Supreme Court on 10 May 2022.

> *Knox, Brotherton, Knox & Godfrey, by Lisa G. Godfrey, H. Edward Knox, and J. Gray Brotherton, for plaintiff-appellant and third-party defendant-appellants.*
>
> *Nexsen Pruet, PLLC, by James C. Smith, for defendant/third-party plaintiff-appellee.*

EARLS, Justice.

¶ 1 Churches exist primarily for the spiritual edification of the adherents of a faith tradition. They are established and operated in accordance with religious precepts.

*See Bd. of Provincial Elders. v. Jones*, 273 N.C. 174, 188 (1968) ("[C]hurches are established for the promulgation of faith under the regulations of definite religious organizations . . . " (cleaned up)). Churches may build sites to house worship, fellowship, community, and teaching. They simultaneously have a secular existence. Many are registered with the state as nonprofit corporations and, by virtue of their status, enjoy exemption from state and federal taxes. They may enter into contracts, dispose of property, seek financing, and make employment decisions. Unsurprisingly, disagreements arise over matters both spiritual and secular. Occasionally, parties seek resolution in civil court. *See, e.g., Atkins v. Walker*, 284 N.C. 306 (1973) (examining a dispute over who was entitled to possession of church property). The role of the court under these circumstances is dictated by the nature of the dispute.

¶ 2     When the resolution of a dispute requires the interpretation of religious doctrines or spiritual practices, the court must abstain from deciding purely religious questions. "The constitutional prohibition against court entanglement in ecclesiastical matters is necessary to protect First Amendment rights identified by the 'Establishment Clause' and the 'Free Exercise Clause.'" *Harris v. Matthews*, 361 N.C. 265, 270 (2007) (citing Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1218 n.129 (2d ed. 2002)).

¶ 3     By contrast, when disputes arise which can be resolved solely through the application of "neutral principles of law" that are equally applicable to non-religious

institutions and organizations, a court's involvement in such a dispute does not "jeopardize[ ] values protected by the First Amendment." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). But spiritual and secular matters are often intertwined. When they are, identifying the boundary between impermissible judicial entanglement and permissible judicial adjudication is a difficult but necessary task. The First Amendment requires us to preserve the exclusive autonomy of religious authorities to answer religious questions, but the State, the public, and religious organizations themselves all have an interest in the courthouse remaining open for the resolution of certain civil claims.

¶ 4    The issue in this appeal is whether any aspects of the claims brought by Pastor Phillip R.J. Davis (Pastor Davis or RJ) against Nation Ford Baptist Church Incorporated (Church), and Nation Ford's Board of Directors (Board) require delving into ecclesiastical matters in violation of the First Amendment. According to Pastor Davis, the Board exceeded its authority under the Church's corporate bylaws when it purported to terminate him by vote of the Board; Pastor Davis contends that the governing bylaws allowed termination only by vote of the Church's congregation at a "Special General Meeting." The Church and the Board assert that the bylaws upon which Pastor Davis relies are not actually the governing bylaws; instead, the Church and the Board contend that pursuant to the terms of the *real* bylaws, Pastor Davis was an at-will employee who could be terminated by the Board at any time.

Which set of corporate bylaws were in effect at the relevant time, whether the Church and Board followed the procedures set forth in the bylaws, and whether there was a contract of employment between Pastor Davis and the Church that was breached are factual and legal questions that are appropriately answered by reference to neutral principles of corporate, employment, and contract law. Thus, the Court of Appeals was correct to affirm the trial court's denial of the Church's motion to dismiss with respect to Pastor Davis's claim for a declaratory judgment. Nonetheless, other claims raise questions that cannot be answered without considering spiritual matters. These claims must be dismissed for lack of subject matter jurisdiction. Accordingly, for the following reasons, we affirm in part and reverse in part the decision of the Court of Appeals affirming the trial court's denial of the Church's motion to dismiss.

## I. Background

In 1988, Nation Ford Baptist Church was created as a North Carolina nonprofit corporation. The Church's Elders and the Church's Senior Pastor, Phillip M. Davis (Pastor Davis's father), were installed as the Church's Board of Directors. The Church's Articles of Incorporation expressly prohibited the Church from having corporate members. Instead, the Articles gave the Board the exclusive authority to represent the Church's congregation. In 1997, the Board adopted a set of bylaws that reserved for itself sole governing authority over the Church, including employment

matters. The Church contends that these bylaws remain in effect to this day.

¶ 7        After Phillip Davis's death in August 2015, his son, RJ, was hired to serve as Senior Pastor. The offer letter accepted by Pastor Davis stated that he was an "at-will" employee. Specifically, the letter provided that

> [a]n "at[-]will" employment relationship has no specific duration. This means that an employee can resign their employment at any time, with or without reason or advance notice.  The [C]hurch has the right to terminate employment at any time, with or without reason or advance notice as long as there is no violation of applicable state or federal law.

Pastor Davis concedes that at the time he was hired by the Church, he believed that the controlling bylaws gave the Board "total control over the governance and operation of the Church." Yet Pastor Davis alleges that, at some point between 2004 and 2008, the Board adopted new bylaws which it later attached to an application for a bank loan it submitted in 2008. The purported second set of bylaws provided that the Bishop of the Church could be dismissed only by a 75% vote of the congregation attending a Special General Meeting called for that purpose.

¶ 8        According to the Church, Pastor Davis's tenure was not a successful one: church attendance reportedly fell by approximately 60% and the Board received numerous complaints about him from churchgoers. On 17 June 2019, the Board voted unanimously to terminate Pastor Davis's employment. Nevertheless, over the next few months and against the wishes of the Board, Pastor Davis continued to conduct

services in church facilities. He allegedly collected and retained tithe money and, when the Church attempted to bar his entry, broke the locks to access the sanctuary in order to conduct unauthorized services.

¶ 9 On 17 September 2019, the Church filed suit in Superior Court, Mecklenburg County seeking a preliminary injunction prohibiting Pastor Davis from entering the Church or speaking with staff. In response, Pastor Davis filed an answer, counterclaim, third-party complaint, and motion for injunctive relief seeking (1) a declaratory judgement establishing that he remained the "Bishop, Senior Pastor, and spiritual leader" of the Church, that he "was not an 'at-will' employee," that the bylaws included in the 2008 loan application controlled the terms of his employment, that his termination was unlawful, and that his appearances on church property were lawful; (2) injunctive relief allowing him to resume his employment; (3) damages arising from the Board's breach of a fiduciary duty it owed him; (4) damages resulting from the Board's tortious interference with his employment relationship; and (5) access to the Church's financial records and establishment of a constructive trust for funds the Board had allegedly misappropriated.

¶ 10 The trial court granted the Church's preliminary injunction on 30 October 2019. On 22 April 2020, the Church filed a motion to dismiss Pastor Davis's counterclaim and third-party complaint, arguing that the trial court lacked subject matter jurisdiction because resolving Pastor Davis's claims would require the court

to impermissibly review ecclesiastical matters. The Church also alleged that Pastor Davis had violated the terms of the preliminary injunction by "bully[ing] and harass[ing]" church employees and continuing to conduct unsanctioned services. Shortly thereafter, Pastor Davis filed a motion to amend his answer, counterclaim, and third-party complaint. His amended filing largely mirrored its previous iterations but added defenses based on quasi estoppel and ratification. Pastor Davis also added a request for back pay from the date of his termination, removed his request to be recognized as the Church's "spiritual leader," and included a new claim based on allegations that the Board had engaged in a civil conspiracy.

On 22 July 2020, the trial court entered an order denying the Church's motion to dismiss and granting Pastor Davis's motion to amend his counterclaim and third-party complaint. The Church appealed. *See Nation Ford Baptist Church Inc. v. Davis*, 279 N.C. App. 599, 2021-NCCOA-528, ¶ 1. A majority of the Court of Appeals panel affirmed. *Id.* ¶ 2.

The principal issue before the Court of Appeals was "whether the resolution of [Pastor] Davis's claims would require our [c]ourts to interpret religious matters in violation of the ecclesiastical abstention doctrine which stems from the First Amendment to the United States Constitution." *Id.* Without deciding whether the trial court would have jurisdiction to fully resolve all the claims Pastor Davis asserted, the majority reasoned that because "there is no *guarantee* that our [c]ourts

will be forced to weigh ecclesiastical matters at this stage of the proceedings," the trial court properly denied the Church's motion to dismiss. *Id.* (emphasis added).

¶ 13        According to the majority, "[t]he core tenet upon which all of Davis's claims depend is the determination of which bylaws governed the Church at the relevant time." *Id.* ¶ 18. In the majority's view, a two-part inquiry would be required to resolve this "employment dispute." *Id.* First, the trial court would need to determine "which bylaws were governing authority at the relevant time, and whether Davis's termination was in accordance with the proper bylaws." Second, the trial court would need to determine "whether the Elders properly determined that Davis was unfit to serve as Senior Pastor of the Church." *Id.* ¶19. The majority concluded that answering the first question of which set of bylaws applied could be accomplished "by applying neutral principles of law without engaging in ecclesiastical matters," specifically by applying "solely . . . contract and business law." *Id.* ¶ 20.

¶ 14        The majority added that if the trial court determined that "the Church's method of terminating Davis did not comply with the requirements of the controlling bylaws," then his termination would be "void." *Id.* But if the trial court determined that "the Church's method of terminating [Pastor] Davis *did* comply with the requirements of the controlling bylaws, then our [c]ourts would be required to assess whether the Church, through its Elders, properly determined that [Pastor] Davis was unfit to serve as Senior Pastor." *Id.* ¶ 21. While acknowledging that this latter

question "may require an impermissible engagement with ecclesiastical matters," the majority reiterated that the trial court could proceed at this time because resolution of Pastor Davis's claim might not *require* the trial court to "be forced to answer this second question." *Id.*[1]

Judge Murphy dissented from the majority's conclusion that the trial court possessed subject matter jurisdiction over any of Pastor Davis's claims at this stage of the proceedings. *Id.* ¶ 33 (Murphy, J., concurring in part and dissenting in part). According to the dissent, the trial court lacked subject matter jurisdiction over Pastor Davis's original counterclaim because that claim "repeatedly requested judicial recognition that he is 'the Bishop, Senior Pastor and *spiritual leader* of the Church.' " *Id.* The dissent reasoned that even if the trial court properly granted Pastor Davis leave to amend his counterclaim, "the removal of 'spiritual leader' [from the initial counterclaim] underscores the religious nature of the 'Bishop' and 'Senior Pastor' terms, as well as the similarity and connectedness of all three terms." *Id.* Furthermore, even if the second set of bylaws controlled, the dissent contended that the trial court could not assess whether Pastor Davis's termination was improper because "[w]hat constitutes [ ] a special meeting to dismiss [Pastor] Davis from [his] role, as well as the definition of congregants or members of the Church, are

---

[1] The Court of Appeals also concluded that Pastor Davis had standing to bring the claims raised in his counterclaim and third-party complaint. *Nation Ford*, 2021-NCCOA-528, ¶ 23. That issue is not presently before this Court.

ecclesiastical matters, which courts may not analyze and where we may not exercise the authority of the State." *Id.* ¶ 35. Thus, the dissent would have held that "judicial analysis of [Pastor] Davis's original counterclaim requires impermissible entanglement in this dispute, as no neutral principles of law can be applied to determine whether Davis is the spiritual leader of the Church, whether a special meeting was held to dismiss him from that role, and who constituted a congregant or member of the Church." *Id.* ¶ 36.

## II.  Analysis

This litigation involves both the Church's original complaint for injunctive relief and monetary damages against Pastor Davis, and Pastor Davis's counterclaim and third-party complaint against the Church. The instant interlocutory appeal relates only to the trial court's 22 July 2020 Order Denying Plaintiff's and Third-party Defendants' Motion to Dismiss Defendant's Counterclaim and Third-party Complaint and Granting Defendant's Motion to Amend Counterclaim and Third-Party Complaint, and only to the extent that the trial court concluded that it had subject matter jurisdiction to proceed. "We review Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction de novo and may consider matters outside the pleadings." *Harris*, 361 N.C. at 271.

The principle that civil courts lack subject matter jurisdiction to resolve disputes involving "purely ecclesiastical questions and controversies" has long been

recognized by this Court. *Braswell v. Purser*, 282 N.C. 388, 393 (1972); *see also Melvin v. Easley*, 52 N.C. 356, 365 (1860) (Manly, J., concurring) ("The State confesses its incompetency to judge in spiritual matters between men or between man and his Maker, and leaves in all a perfect religious liberty to worship God as conscience dictates, or not to worship Him at all, if they can so content themselves."). This doctrine is rooted in the First Amendment's goal of fostering "a spirit of freedom for religious organizations, an independence from secular control or manipulation–in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). It safeguards interests protected by both the Free Exercise and Establishment Clauses. *See, e.g.*, *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987) ("By adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs. Moreover, by entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks 'establishing' a religion.").

¶ 18     However, "the First Amendment does not provide religious organizations absolute immunity from civil liability." *Johnson v. Antioch United Holy Church, Inc.*, 214 N.C. App. 507, 511 (2011). When the State has a legitimate interest in resolving a secular dispute, "civil court is a proper forum for that resolution." *Presbyterian,* 393

U.S. at 445; *see also Reid v. Johnston*, 241 N.C. 201, 204 (1954) ("[T]he courts do have jurisdiction, as to civil, contract and property rights which are involved in, or arise from, a church controversy."). The State's interest in providing a neutral forum for resolving disputes involving religious organizations engaged in secular activities is obvious: the State would be unable to maintain "[t]he course of constitutional neutrality" towards religion that the First Amendment demands if religious organizations could define for themselves the laws to which they are subject. *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970). The public at large and religious organizations also have an interest in the courthouse remaining open for the resolution of civil disputes: the contractors, vendors, lenders, and employees upon whom religious organizations depend to assist in the more prosaic elements of operating a nonprofit corporation might think twice about providing their services if there were no neutral forum for resolving the kinds of disputes that inevitably arise in the course of everyday business. *Cf. Reid*, 241 N.C. at 204 ("This principle may be tersely expressed by saying religious societies have double aspects, the one spiritual, with which legal courts have no concern, and the other temporal, which is subject to judicial control.").

¶ 19        Consistent with these First Amendment principles, the impermissible entanglement doctrine precludes judicial involvement only in circumstances involving "disputes [that] implicate controversies over church doctrine and practice." *Presbyterian*, 393 U.S. at 445. We have previously identified such ecclesiastical

matters to include those concerning (1) religious doctrines or creeds; (2) the church's form of worship; (3) the adoption of regulations concerning church membership; and (4) the power to exclude from membership or association those whom duly authorized church officials deem unworthy of membership. *See E. Conf. of Original Free Will Baptists v. Piner*, 267 N.C. 74, 77 (1966), *overruled in part on other grounds by Atkins*, 284 N.C. 306. In addition, impermissible entanglement may arise either when a court resolves an underlying legal claim or when it issues a form of relief. *See W. Conf. of Original Free Will Baptists v. Creech,* 256 N.C. 128, 141–42 (1962) (modifying preliminary injunctions which granted relief in excess of the trial court's jurisdiction in dispute between two factions of a church over who was the pastor).

¶ 20        Still, "[c]ivil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Atkins*, 284 N.C. at 316 (quoting *Presbyterian*, 393 U.S. at 449). Thus, to determine whether a civil court has jurisdiction to entertain a dispute, "[t]he dispositive question is whether resolution of the legal claim requires the court to interpret or weigh church doctrine." *Smith v. Privette,* 128 N.C. App. 490, 494 (1998) (citation omitted). If a claim can be resolved solely by applying neutral principles of law, there is no impermissible entanglement. *Cf. Johnson*, 214 N.C. App. at 512 ("[A]pplying a secular standard of law to secular tortious conduct by a church is not prohibited by the Constitution . . . ."); *see also Presbyterian,* 393 U.S. at 449 ("[T]here are neutral principles of law, developed for

use in all property disputes, which can be applied without 'establishing' churches to which property is awarded."). In general, "[w]here civil, contract[ ] or property rights are involved, the courts [can] inquire as to whether the church tribunal acted within the scope of its authority and observed its own organic forms and rules." *Creech,* 256 N.C. at 140–41.

¶ 21     In this case the Court of Appeals reasoned that Pastor Davis's claim was "analogous" to the wrongful termination claim at issue in an earlier Court of Appeals decision, *Tubiolo v. Abundant Life Church, Inc,* 167 N.C. App. 324 (2004). We agree that the claims are similar and that the Court of Appeals' reasoning in *Tubiolo* is persuasive and applies in this case. In *Tubiolo,* several one-time church members claimed that their church's governing council violated the church's bylaws by improperly terminating their membership. 167 N.C. App. at 325–26. While the Court of Appeals forbade the trial court from involving itself in deciding whether the "grounds for termination of church membership are doctrinally or scripturally correct," the Court of Appeals explained that the trial court could address the members' claim that "their membership was improperly terminated [because] the persons purporting to terminate their membership were without authority to take that action." *Id.* at 328. The church's bylaws dictated who within the church structure possessed the authority to terminate membership; the one-time members argued that these bylaws "were [not] properly adopted by the [church]." *Id.* at 329. The Court of

Appeals concluded that whether the bylaws were properly adopted and who was authorized to terminate membership were inquiries that could "be made without resolving any ecclesiastical or doctrinal matters." *Id.*

¶ 22    The same basic logic dictates the outcome of this case. Some of Pastor Davis's claims and the relief he seeks thereunder are predicated on his assertion that the Board lacked the authority to terminate his employment under the Church's governing bylaws. Specifically, paragraphs 35(b) and 35(c) of his first claim for relief in the amended counterclaim seeking a declaratory judgment that his employment relationship was not "at-will," that his employment was governed by the new bylaws, and that the Church did not follow the procedure required by those bylaws are appropriately resolved by application of secular, neutral legal principles. North Carolina law gives courts the authority "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." N.C.G.S. § 1-253 (2021). To resolve these questions, the trial court will need to determine which set of corporate bylaws applied to Pastor Davis's employment contract, who had the authority to act on behalf of the Church in employing Pastor Davis, who could terminate his employment, and whether the 27 January 2016 letter signed by three Elders and the business manager and signed as "agreed" by Pastor Davis established an at-will employment relationship or created certain contractual rights. If the trial court determines that the Board acted outside the scope of the authority afforded to

it under the governing bylaws, then Pastor Davis will be entitled to declaratory relief to that effect. This inquiry does not require engaging any doctrinal or ecclesiastical matters. The answer to the question of whether members of a religious organization "acted within the scope of [their] authority and observed [the organization's] own organic forms and rules" is found in neutral principles of secular law, at least "[w]here civil, contract[ ] or property rights are involved." *Creech,* 256 N.C. at 140. Still, when "undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining [the document's meaning]." *Jones v. Wolf*, 443 U.S. 595, 604 (1979). And, as the United States Supreme Court has recognized, "there may be cases where the [document] incorporates religious concepts in the [relevant] provisions," such that "the interpretation of the [documents] would require the civil court to resolve a religious controversy;" when this occurs, "the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.*

¶ 23   But in all other respects the first claim for relief goes too far, particularly in the remedy sought,[2] because the court can neither declare Pastor Davis the spiritual leader of the Church nor require that he be allowed to conduct services. Addressing this controversy would entangle the court in religious matters such as whether Pastor

---

[2] In addition to the declarations referenced here, the amended counterclaim also added a request for back pay under the first claim for relief which goes beyond declaratory relief. It is discussed below.

Davis adequately performed his duties as a pastor as that role is understood in accordance with the Church's faith and religious traditions. In contrast to the all-or-nothing approach urged by the Church—and, to be fair, the approach implicitly adopted by the trial court and Court of Appeals—a claim-by-claim analysis is required. *Tubiolo*, 167 N.C. App. at 328–29 (independently examining the plaintiffs' three separate bases for their claim challenging the termination of their church membership).

¶ 24 A court is never permitted to examine "the church's view of the role of the pastor, staff, and church leaders . . . . [b]ecause a church's religious doctrine and practice affect its understanding of each of these concepts." *Harris*, 361 N.C. at 273. Thus, a court cannot assess Pastor Davis's third claim for relief for breach of fiduciary duties because a court cannot answer the question of whether the Board "in good conscience . . . act[ed] honestly, in good faith and *in the best interests of the Church*." Similarly, a court cannot assess whether the Board acted "*without justification*" in seeking the termination of Pastor Davis's employment as he asserts in his tortious interference claim, the fourth claim for relief, or whether certain funds were "*properly devoted to the Church's benefit*" as he asserts in his fifth claim for relief alleging

misappropriation of church funds.[3] These claims are not predicated on an assertion that the Board acted in excess of its authority under the Church's corporate bylaws—rather, they are predicated on an assertion that the substantive reasons the Board chose to exercise its purported authority did not advance the mission of the Church. Resolving these claims would necessarily require a court to examine whether the Board's actions could be justified in light of Church doctrine.[4] This is a function the First Amendment forbids courts from performing. *Cf. Atkins*, 284 N.C. at 318 ("What is forbidden by the First Amendment . . . is a determination of rights . . . on the basis of a judicial determination that one group of claimants has adhered faithfully to the fundamental faiths, doctrines and practices of the church . . . .").

The most difficult claim to assess is Pastor Davis's second claim for relief seeking a preliminary and permanent injunction requiring the Church to allow him

---

[3] In concluding that Pastor Davis's claim alleging that the Board misused funds must be dismissed, we do not imply that all disputes arising from the appropriation of funds by the directors of religious organizations necessarily involve ecclesiastical matters. For example, if Pastor Davis had alleged that the Board was using certain funds to operate a summer camp, notwithstanding a provision of the bylaws dictating that these same funds were set aside to be used only for building a new sanctuary, it is plausible that a court could have jurisdiction to resolve such a claim. However, examining Pastor Davis's general assertion that the funds were misappropriated because they were not "properly devoted to the Church's benefit" would require comparing the amount of "benefit" produced by various possible activities, a judgment that can be made by Church authorities but not by the courts.

[4] We note that our analysis of the trial court's *jurisdiction* to adjudicate a dispute under the ecclesiastical abstention doctrine is distinct from the First Amendment ministerial exception doctrine, which "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar" and is not at issue in this case. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012).

to (1) "resume his role and duties as the Bishop and Senior Pastor of the Church, with full compensation and benefits, until such time as the Church's congregation may vote to remove Pastor RJ in accordance with the requirements of the New Bylaws of the Church" and (2) allow him to enter Church premises. Although not clearly stated, Pastor Davis's request for injunctive relief appears to be based on a breach of employment contract theory.[5] This type of claim may be susceptible to resolution by application of neutral principles of law. But even if, as Pastor Davis alleges, third-party defendants breached an employment contract they made with him, there is nothing to indicate that his requested relief of reinstatement "with full compensation and benefits" is the appropriate remedy. Similarly, whether "back pay from the date of the purported termination" as requested in the amended counterclaim's first claim for relief is an available remedy depends on whether there was, in fact, an employment contract and what the terms of that contract or general contract law provide in the event of a breach. At this stage our review is limited to whether the claims or the relief sought raise issues of inappropriate entanglement of secular courts in religious matters.

---

[5] Paragraph 34 of the second claim for relief asserts that third party defendants have "interfered" with Pastor Davis' employment relationship, which appears to imply they have breached their contract with him in that third-party defendants are three of the four individuals who signed the 27 January 2016 offer of employment.

¶ 26 On the other hand, if Pastor Davis's second claim for relief is based on a theory that the third-party defendants tortiously interfered with the employment relationship by criticizing his leadership, as referenced in paragraphs 25 and 26 of the amended counterclaim, this claim for relief is barred on First Amendment grounds. A secular court cannot second-guess the Board's evaluation of Pastor Davis's job performance. In short, the trial court can decide any matters of civil law that relate to whether an employment contract exists, what its terms might be, what bylaws might govern, and whether procedures required by those bylaws were followed.[6] Thus, to the extent Pastor Davis' second claim for relief is based on a breach of employment contract theory, the trial court can proceed to answer these purely civil law questions. However, the trial court cannot review the substance of decisions made by duly authorized Church officials regarding doctrinal matters; on these matters, a civil court cannot substitute its judgment for that of the Church. Thus, to the extent Pastor Davis' second claim for relief is based on a tortious interference claim, the trial court cannot proceed because doing so would engender impermissible entanglement with ecclesiastical matters.

¶ 27 As with any ruling on a motion to dismiss, our decision to affirm the trial court's denial of the Church's motion to dismiss with respect to certain claims does

---

[6] To the extent church bylaws give the Elders discretion to exercise certain authority that is limited by doctrinal considerations, a civil court will have no ability to second guess whether the Elders exercised that authority consistently with those doctrinal considerations.

not mean dismissal of those same claims might not be required at a later stage on other grounds. Still, the Church is wrong to suggest that the trial court lacks subject matter jurisdiction over *all* claims entirely if *any* "condition or element of a cause of action" involves ecclesiastical matters. The specific relief a plaintiff seeks does not dictate a court's jurisdiction to adjudicate a claim. Rather, a court must have jurisdiction over "the *nature* of the case and the *type* of relief sought in order to decide a case," not over every possible fact pattern and legal issue connected to a complaint. *Catawba County ex rel. Rackley v. Loggins*, 370 N.C. 83, 88 (2017) (cleaned up) (emphases added). At this stage a court must only assure itself that *any* of the plaintiff's claims can possibly be adjudicated and that *any* form of relief can possibly be granted—if so, the court has jurisdiction to proceed on those claims.[7] The trial court was correct to deny the Church's motion to dismiss with respect to the claim for declaratory relief as described above.

---

[7] The Church also argues that the trial court erred in granting Pastor Davis leave to amend his answer, counterclaim, and third-party complaint. To the extent the dissent disagreed with the majority's decision to affirm the trial court's allowance of Pastor Davis's motion for leave to amend his filings, his dissent was based solely on his contention that "the original counterclaim should have been dismissed as requiring impermissible judicial entanglement in ecclesiastical matters." *Nation Ford*, 2021-NCCOA-528, ¶ 37 (Murphy, J., concurring in part and dissenting in part). Because we have concluded that the trial court did not err in denying the Church's motion to dismiss—and because, as the Church acknowledges, its argument regarding the motion to amend is "congruent to and inseverable from the issues regarding subject matter jurisdiction"—we also affirm the portion of the decision below affirming the trial court's allowance of the motion to amend.

### III. Conclusion

The impermissible entanglement doctrine limits a court's authority to resolve disputes involving religious organizations. Courts possess jurisdiction over only those claims that can be resolved through application of neutral principles of secular law that govern all similar organizations and entities. A court must carefully distinguish between claims that will necessarily require it to become entangled in spiritual matters and those that can potentially be resolved purely on civil grounds. Essentially, if the issues raised in a claim can be "resolved on the basis of principles of law equally applicable to" an "athletic or social club," then the court has jurisdiction to proceed. *Atkins*, 284 N.C. at 319. If the issue raised in a claim requires the court to "determine ecclesiastical questions" or wade into "a controversy over church doctrine," then a court may not proceed because doing so would be "wholly inconsistent with the American concept of the relationship between church and state." *Presbyterian*, 393 U.S. at 445–46.

In this case, Pastor Davis's claim for a declaratory judgment establishing which bylaws apply, whether the Church procedurally followed those bylaws, and whether there was an employment contract between Pastor Davis and the Church incorporating the applicable bylaws can potentially be resolved solely by application of neutral principles of corporate, contract, and employment law. At this stage of the litigation, that conclusion is sufficient to allow him to proceed. By contrast, First

Amendment principles require the dismissal of Pastor Davis's other claims, including portions of the first and second claims for relief and all of the third, fourth, and fifth claims for relief in the amended counterclaim, which challenge the Board's judgment on grounds necessarily implicating Church doctrine and practice. Accordingly, we affirm in part and reverse in part the Court of Appeals' decision affirming the trial court's denial of the Church's motion to dismiss and remand this case to the Court of Appeals for further remand to the Superior Court, Mecklenburg County for proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.